**NATIONAL LABOR RELATIONS BOARD,**

v.

**NATIONAL PAPER COMPANY,** Southern Detectives, Inc. and James M. Fier.

No. 14945.

United States Court of Appeals Fifth Circuit.

Nov. 16, 1954.

John S. Patton, Atty. N. L. R. B., Atlanta, Ga., A. Norman Somers, Asst. Gen. Counsel, David P. Findling, Associate Gen. Counsel, George J. Bott, Gen. Counsel, Bernard Dunau, Robert G. Johnson, Attys, N. L. R. B., Washington, D. C., for petitioner.

Frank A. Constangy, John M. Slaton, M. A. Prowell, Atlanta, Ga., for National Paper Co., for respondent.

Hugh Howell, Hugh Howell, Jr., Atlanta, Ga., for Southern Detectives, Inc., and James M. Fier.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

RIVES, Circuit Judge.

The Board petitions for enforcement of its order issued against respondents on February 24, 1953, based on findings that respondent, National Paper Company (hereinafter called National), violated Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1), by threatening its employees with discharge for union membership, promising them benefits if they renounced the union, and otherwise unlawfully interrogating them as to their union activities; that respondent National had further violated Sections 8(a) (3) and (1) of the Act by discharging an employee, Dorothy Cole, because she joined the union; and had refused to bargain with the union in good faith, in violation of Section 8(a) (5) and (1) of the Act. The Board further found that respondents National and Southern Detectives, Inc. (hereinafter called Southern) had jointly engaged in unlawful interference and restraint of National's employees, in violation of Section 8(a) (1) of the Act, by subjecting them to coercive surveillance by armed guards during an impasse in bargaining negotiations culuminating in a strike; and finally, that all three respondents were jointly responsible for certain threatening and insulting telephone calls found to have been made during the strike to National employee Jewell Sanders by one of the armed guards, the individual respondent Fier, in further violation of Section 8(a)

(1) of the Act. See 29 U.S.C.A., § 151 et seq. The decision and order of the Board are reported at 102 N.L.R.B. 1569.

Respondent National is a Georgia corporation with its principal office in Atlanta, Georgia, where it is engaged in the processing and sale of paper products. In January, 1951, the union [1] undertook to organize National's employees. At a Board-conducted election held on March 15 the union prevailed, and on March 27 it was certified as the exclusive bargaining representative for the 67 employees in the unit.

## I. The Board's findings of interference and restraint.

Bargaining conferences were begun on May 14, and there is some testimony, credited by the Trial Examiner and the Board, that while negotiations were being held National's superintendent Elliott told employees, Pritchard and Keith, that they "would have already had a raise" but for the advent of the union in the plant, and that he would guarantee their jobs if they would withdraw from the union, but that if they ever "walked out" they would not "have a job back in the plant." According to further testimony, another employee, Harry Hall, whose authority to bind respondent National is strongly disputed, told a then recently hired worker, James Heard, that it was "a pretty good thing" he did not belong to the union, or he would not "have a job any more".

▮ The above recited testimony incorporates substantially all of the probative evidence upon which the Board's findings of interference and restraint may lawfully be based,[2] though admittedly there is other credited testimony properly referable to the refusal to bargain charge which purports to quote remarks by Superintendent Elliott to employees Smith, Sanders, and Cole to the effect that National's president, Wellhouse, would never sign a contract with the union. Elliott denied making these statements, and both he and Wellhouse further denied making any remarks concerning Wellhouse's aversion to an agreement with the union, though their testimony was rejected by the Trial Examiner and Board. Elliott testified affirmatively that, in order to dissipate a rumor circulated by the union in June, 1951, to the effect that National would discharge any employee who withdrew from the union for prior activity in its behalf, he informed the employees that, whether they renounced the union or not, "they wouldn't lose their job as long as anyone come there and did their work, * * * that they could feel safe." Credibility of the witnesses was primarily for the Trial Examiner's determination, and if we accord to his Intermediate Report and to the Board's findings based thereon the usual presumption that the Examiner had the best opportunity to hear and observe the witnesses and to judge of their credibility, we would hold that the Board's findings of interference and restraint are supported by substantial evidence. For reasons hereafter to be stated, we cannot in this case accord to the Examiner's report and the Board's findings based thereon the full measure of the usual presumption of correctness.

1. Atlantic Paper Products and Specialty Workers, Local No. 527, an affiliate of the International Printing Pressmen and Assistants' Union of North America, AFL.

2. The testimony does reveal certain coercive remarks to a number of National employees by Superintendent Elliott and Foreman Peek in March, 1951, which the Trial Examiner conceded could not furnish the basis for findings of independent 8(a) (1) violations by respondent National, since they were admittedly barred by the six months' limitation proviso of section 10(b) of the Act. However, the Examiner, with tacit Board approval, did accord this testimony weight as "background evidence" supporting the other violations found, see I. B. S. Mfg. Co. v. N. L. R. B., 5 Cir., 210 F.2d 634, even though much of this testimony hinges on the credibility of Jewell Sanders, a witness discredited in large measure by the Board itself.

II. The discharge of Dorothy Cole.

Of the 67 employees in the bargaining unit, Dorothy Cole is the only one[3] claimed to have been discriminatorily discharged prior to the strike. She was hired on a trial basis on July 26, 1951, along with another probationary employee, Rachel Wood. After a trial period lasting for approximately 14 working days she was discharged, according to Superintendent Elliott, for inefficiency and inability to learn her job. It is undisputed that the other employee, Rachel Wood, who had been hired at the same time and on the same trial basis as Cole, was not discharged prior to the strike, though she was also a union member.

■■ The Board found that Cole's joining the union actually precipitated her discharge, and that respondent's claim as to her inefficiency was but a pretext in view of testimony by Cole and other union members "that Elliott expressed satisfaction with her work". On the basis of this record, however, it seems to us that the validity of the Board's finding and reinstatement order as to Cole hinges mainly upon the sufficiency of the evidence to impute knowledge of Cole's union membership to respondent, in view of the settled principle that at least some legally justifiable inference of employer knowledge of a dischargee's union membership is an essential prerequisite to a valid finding of discriminatory discharge therefor. See N. L. R. B. v. Whitin Machine Works, 1 Cir., 204 F.2d 883, 884; Tampa Times Co. v. N. L. R. B., 5 Cir., 193 F.2d 582, 583; N. L. R. B. v. Westinghouse Electric Corp., 6 Cir., 179 F.2d 507. The evidence fails to show that Cole's union affiliation was brought to respondent's attention during her short tenure at the plant other than on the basis of pure inference and suspicion, in the manner hereinafter set forth.

■ In respondent National's behalf, Superintendent Elliott testified positively that he had no knowledge of Cole's union membership until he saw her with Rachel Wood on the picket line during the strike of August 16th, which took place two days subsequent to Cole's discharge, though his testimony was not credited by the Board. However, it is conceded that both the Trial Examiner and the Board inferred respondent's knowledge of Cole's union adherence from a conversation between another employee, Jewell Sanders, and the owner of a local restaurant, in which Sanders stated in the presence of a National supervisor, Scarborough, that Cole had joined the union, which information the Trial Examiner "reasonably inferred" was communicated to Superintendent Elliott and prompted her discharge, in spite of Scarborough's testimony denying the incident and his uncontradicted denial of having heard the alleged conversation, and despite further denials both by him and Elliott that he ever reported any such information concerning Cole. A majority of the Board, apparently recognizing the weakness of the Trial Examiner's inference as to respondent National's knowledge of Cole's union membership in view of the testimony of Scarborough and Elliott, sought support in stating that "Respondent's plant complement was so small as to justify the inference that the union activities of its employees generally, including those of Cole, came to the notice of higher management officials."[4] Testimony which requires the pyramiding of so many inferences in order to sustain a finding of a discriminatorily motivated discharge cannot legitimately substitute for that

3. It is significant, we think, that though Superintendent Elliott knew of the union membership of a number of employees who discussed the matter with him, there was no contention that any of the Union's leaders, or its members other than Cole, whose union activities were not conspicuous, were discharged or in any way discriminated against.

4. Member Peterson differed from the Board majority's finding that Cole's discharge was violative of the Act, taking the position "that the evidence does not sufficiently establish National's knowledge of her interest in the Union."

"substantial evidence" essential to enforcement of a Board order. Accordingly, the Board's findings and order as to the discriminatory discharge of this employee must be denied enforcement.[5] N. L. R. B. v. Shen-Valley Meat Packers, 4 Cir., 211 F.2d 289; N. L. R. B. v. Falls City Creamery Co., 8 Cir., 207 F.2d 820; N. L. R. B. v. Radcliffe, 9 Cir., 211 F.2d 309.

III. The Board's findings of respondent National's refusal to bargain and the resulting strike.

Following the union's certification on March 27, 1951, only three bargaining conferences were held before the strike of August 16th. The testimony is in conflict as to the progress made at the meetings of May 14, June 8, and August 4, the Board contending it shows that National made only minor and illusory concessions, and rendered the consummation of any agreement impossible through its adamant refusal to consider or grant any wage increase or "fringe benefits"[6] demanded by the union. National, however, while conceding that it has consistently, though justifiably, refused to submit to the union's equally stubborn insistence upon a wage increase and other monetary demands, vigorously protests the validity of the Trial Examiner's conclusion that, by such refusal, it has refused to bargain in good faith, as well as the Board's finding that it "approached the conference table with a mind hermetically sealed against reaching agreement." It insists that the testimony as to its attitude throughout bargaining negotiations, viewed fairly and objectively, reveals that it complied with both the letter and spirit of Section 8(a) (5) by making written proposals, counter-proposals, and numerous concessions to union demands, particularly as to seniority, grievance procedure, holiday and reporting pay, etc., but that the impasse in negotiations which precipitated the union's economic strike on August 16th was caused solely by the union's unyielding insistence upon a wage increase, which good faith bargaining could not compel National to grant, particularly in view of the undisputed fact that it could not obtain a commensurate increase on the price of its products because of OPS ceiling prices then in effect.

We think the findings of respondent National's refusal to bargain in good faith may not be sustained upon this record. Though admittedly there were contributing irritations, we think the major portion of the testimony, including that of a union negotiator, reveals substantially nothing more than a bona fide impasse and economic strike resulting principally from respondent National's refusal to grant any wage increase and the union's refusal to accept anything less.[7] True, the Board found that "National's failure to accept * * * the Union's proposal of a *contingent wage increase*" to some extent objectively revealed that the ceiling price on National's products "was not the true reason for its unyielding position on wages, and that in advancing that reason Na-

---

5. Of course, no inference as to National's discriminatory motivation in discharging Cole may properly be drawn merely from the fact that her union membership antedated her severance from employment. As this Court noted in Tampa Times Co. v. N. L. R. B., 5 Cir., 193 F.2d 582, 583, "Post hoc ergo propter hoc is not sound logic. * * *"

6. Substantially, they embodied union demands for increased vacation, overtime, and "reporting pay", the latter benefit importing a minimum pay guarantee to employees who reported for work without prior notice that no work was available for them that day.

7. Though union negotiators, Baker and Googe, did not testify, negotiator McCann, speaking of the second conference, testified as follows:

"Q. How did the meeting break up; on what point did the meeting break up? A. I believe that was the last statement made, the fact—I made the last statement if the wage increase would be granted, the language of the contract could probably be worked out. I believe that is the last statement.

"Q. Did they indicate that they could make any proposition with reference to wages? A. Not at all."

tional was not dealing with the Union in good faith." However, it seems to us the Board's inference in this respect is without substantial support, for no purely contingent wage increase, as such, appears to have been definitely agreed to by the union, though there is some testimony revealing that the union negotiator, Baker, did suggest that if National would grant an immediate wage increase embodying only a portion of the union's additional 25¢ an hour demand, it would agree to make the remainder contingent upon National's obtaining price relief.[8]

██ In any event, National was not bound at its peril to grant a wage increase. The mere fact that a bona fide impasse in negotiations was reached is no convincing evidence of National's unlawful refusal to bargain, for Section 8(a) (5) does not require an employer's involuntary concession on any issue, or retreat from any bargaining position taken in good faith upon penalty of being held guilty of an unfair labor practice.

N. L. R. B. v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027, affirming American National Ins. Co. v. N. L. R. B., 5 Cir., 187 F.2d 307; N. L. R. B. v. Corsicana Cotton Mills, 5 Cir., 179 F.2d 234. As this Court recently held in N. L. R. B. v. Mayer, 5 Cir., 196 F.2d 286, 290, "Not capitulation, but bona fide effort, is the criterion." See also Texas Foundries v. N. L. R. B., 5 Cir., 211 F.2d 791. Indeed, Section 8(d) of the Act, as amended, specifically provides:

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incor-

8. Union negotiator, Paul Moses, testified:
"Q. Now, Mr. Moses, you made some statement before that is not clear to me about what Mr. Baker's proposal was on wages and prices at this third meeting. A. That was made by Mr. Baker and Mr. Googe both at that meeting. They went over the proposal of you all's contract and our contract. They said if we could get some kind of price, some kind of wage offer in there, that we could iron the rest. And you couldn't all agree on giving any wage offer on account of price control of the product.
"Q. Let me see if I can help your recollection a little, Mr. Moses. Wasn't that at the third meeting? A. That was at the third meeting.
"Q. Mr. Baker was there but Mr. Googe wasn't there? A. No. It was Mr. Baker. That was my mistake.
"Q. Mr. Baker said if we would make some sort of wage offer that he could iron out the rest of the contract? A. That's right.
"Q. Mr. Wellhouse replied that he couldn't because of the price situation? A. That's right. He offered to sign a contract on the price situation, percentage of it.
"Q. In other words, if we would make a wage offer, he would sign a contract and get the rest of the wage offer when he

got a price increase. A. That's right.
"Q. That was the third meeting. Is that the meeting in which we told Mr. Baker we would let him know in a week? A. That's right.
"Q. And that is the way it broke up, our agreeing to call him approximately a week from the date of the meeting? A. That's right."
This testimony was corroborated by union member, Grady Chambers, as follows:
"Q. You remember Mr. Baker doing the talking for the Union, don't you? * * * A. Yes, sir.
"Q. And you heard him say that if the Company would agree to give a wage offer that the rest of the contract would be worked out, didn't you? A. Yes, sir, I did.
"Q. That is the same conversation that Mr. Moses was testifying about? A. Yes."
Jewell Sanders testified about the third and final bargaining conference:
"Q. Do you remember that that was the meeting at which Mr. Baker made the proposal that if the Company would offer even five cents on an interim or temporary basis until they could get price relief, that he would be willing to hold the matter up until they could straighten out the wages? A. Yes."

porating any agreement reached if requested by either party, *but such obligation does not compel either party to agree to a proposal or require the making of a concession* * * *."

We conclude that the Board's order based on findings that National's unlawful refusal to bargain in good faith precipitated an unfair labor practice strike entitling the employees to reinstatement upon their unconditional application, instead of an economic strike resulting, not from National's refusal to bargain, but from a bona fide stalemate on the wage issue, must be denied enforcement as not supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

## IV. The Board's findings of unlawful surveillance.

There is undisputed testimony that on August 10, 1951, the union negotiator, Baker, advised respondent National's counsel, Constangy, that he could not hold the employees any longer, and "he was afraid they were going to strike".[9] Constangy relayed this information to National's president, Wellhouse, that same day, and the latter immediately became apprehensive that a strike was imminent and that violence, with attendant property damage or personal injury, might result, in view of the atmosphere of labor tension which had prevailed in the vicinity.[10] Wellhouse accordingly telephoned respondent Southern, a company recognized in the community as licensed to engage in the business of providing plant protection services, and subsequently entered into a written agreement with that company to furnish plant guards and watchmen during the period in which the threatened strike was considered imminent. On the following Monday, August 13th, respondent Southern furnished two uniformed and armed watchmen for plant protection by day, and one during the night, one of the daytime guards being stationed at respondent National's parking lot while the other guard patrolled the four stories and basement of respondent's plant building while the employees were at work. This practice continued for three days prior to the strike, which was called on the following Thursday, August 16th. In spite of the Board's intimation in brief that all National employees were thereby subjected to "constant surveillance and harassment", there is no convincing evidence that these two guards actually violated their written orders not to molest or interfere with the employees at their work, though there is some testimony revealing that the employees naturally resented their presence. In any event, it is without dispute that at no time during this three-day period was there any protest or complaint based on the presence of the guards lodged with respondent by any employee or the union, and neither the Trial Examiner or the Board made

---

9. The trial Examiner rejected this uncontradicted testimony, commenting in part as follows:

"As a witness, Wellhouse claimed that he contracted for the services of the armed guards because his attorney told him, on August 10, that he had received a telephone call from George Baker, an official of the Union, in which Baker had said 'he didn't think he would be able to hold his people in line and he was afraid they were going to strike.' Wellhouse further claimed that he hired the armed guards 'to protect the property as well as the people if there should be any labor strike.' Although the claim of Wellhouse as to his telephone call from his attorney finds support in the testimony of that attorney, to the effect that on August 10 Baker told him that 'in his judgment the Union would have to resort to its economic strike,' and although Baker himself was not called as a witness and therefore the testimony stands uncontradicted, the Trial Examiner has grave doubt that Baker, on August 10, warned the Respondent of a strike."

10. It is undisputed that a few days prior to Wellhouse's notification of the threatened strike, there had been a labor disturbance at the nearby plant of Atlanta Metallic Casket Company, which had caused some property damage.

any finding to that effect. Nevertheless, the Trial Examiner characterized National's employment of the guards as "flagrant interference" with the employees' rights, as an act undertaken "with the intent and purpose of precipitating the strike" and altering employee "working conditions" "to those of a chain gang." We think the use of such intemperate language at the Trial Examiner level, where the crucial record in all these strongly contested disputes is made, was indeed unfortunate, for intemperate and vituperative characterization of employer action in an admittedly equivocal situation, even if deserved, hardly bespeaks that calm and dispassionate judgment which a just disposition of such proceedings requires. Nor do we think that the findings and order in this respect are enforceable on the Board's alternative theory that the guards were employed for the opposite purpose of coercing the employees "to refrain from striking". While the issue of whether, under all the facts and circumstances of a particular case, surveillance of employees is for the lawful purpose of plant protection, or for the prohibited purpose of employee restraint and intimidation, is a question of fact generally to be resolved by the Board upon substantial evidence, we think there is no substantial evidence in support of its finding here. Respondent National having made a reasonable showing of its good faith in retaining such services solely for plant or personnel protection, after notification of an impending strike, we think an unlawful and improper motive ought not be imputed to National on any theory advanced either by the Trial Examiner or the Board. See N. L. R. B. v. Houston Chronicle Publishing Co., 5 Cir., 211 F.2d 848, 854. We think the Trial Examiner's and Board's reasoning in this regard is fairly subject to the criticism that an employer's exercise of business judgment in an admittedly tense situation ought not be so narrowly scrutinized, weighed in delicate balance and subjected to such strict hindsight review as to the necessity of specific action taken on the basis of "ex post facto criticism" from persons not actually confronted with the emergency.[11] It follows that the provision of the Board's order based on findings of unlawful surveillance by all three respondents is not supported by substantial evidence and may not be enforced.

## V. Coercive conduct of individual respondent, James Fier.

The testimony of the local union secretary, Jewell Sanders, is to the effect

11. The Trial Examiner injected into the case the tenuous theory that respondent National's action in hiring the guards without prior notification to the union was tantamount to unilateral alteration of their "working conditions", in violation of Section 8(a) (5), in spite of the fact that the impasse in bargaining negotiations had by then rendered further consultation practically futile. No such contention was ever advanced either by the union or counsel for the Board at the hearing. He further held that, "Even if the testimony of Wellhouse be so construed as to indicate that he was innocently misled into believing that a strike would occur on Monday morning, August 13, and that out of anticipatory fear he hired armed guards to protect property and persons, although no threats against either had been received, that expressed reason vanished on Monday, when all employees reported as usual, and no strike 'came off.'" The Board, however, reasoned thus:

"Like the Trial Examiner, we reject the contention of Respondents National and Southern that the guards were hired only for the purpose of protecting National's property and employees in the event of an anticipated strike. No satisfactory explanation has been offered as to why, in accomplishing this purpose, it was necessary for the guards to patrol the production area of the plant and watch the employees at their tasks. The alleged protective purpose could have been as well served, without any harassing effect on the employees, by stationing the guards at appropriate points adjacent to the production area, where they would be readily available in case of any strike emergency. Moreover, whatever violence a strike might have been expected to engender, there is nothing in the record to show that National had any reason to believe that such violence would occur, contrary to normal experience, *inside* the plant and *before* the employees walked out."

that in October, 1951, when the strike had been in progress about two months, an unidentified person made a number of insulting and abusive night telephone calls to her harassing her with irresponsible accusations of sexual immorality, and threats against the safety of herself and family. After the disturbing calls had continued for a period of several weeks, Sanders and her mother supposedly identified the voice of the anonymous caller as belonging to James Fier, one of the watchmen employed by respondent Southern, who had been assigned to night watchman duties at National's plant. As identifying Fier with the anonymous caller and fastening National with responsibility for his calls, the examiner refers to parts of Sanders' testimony:

"One night, in October, immediately after cutting off Fier's call, she dialed the operator, said she had been cut off, and asked if she would reconnect or give her the number so she could dial back. The operator gave her 'CY4'—and then stopped, saying she was sorry but she could not give her any more information.

"The telephone number at the plant of the Respondent National is CY 4655.

\* \* \* \* \* \*

"Sanders had occasion to deliver a message to a member of Atlanta's police force, who was sitting in a car with one Swan Smith, another of Respondent Southern's armed guards, outside the plant. She asked the officer if she could speak to him alone. Smith got out, making some surly remark that aroused Sanders. She said, 'Look here, you. I know who has been making those 'phone calls to my home just as well as you do, now \* \* \* I traced the call one night.' According to her unchallenged testimony Smith turned white, ran into the plant,—and from that day on no more telephone calls of this nature were received by her."

In part the testimony of Jewell Sanders reads:

"A. Yes, I told Swan Smith, I said, 'I traced the call one night.' The operator gave me the first three letters. I think it was because I was so excited. I told her I had been broken—my conversation had been broken off with the party on the other line and I asked her would she connect us back or give me the number where I could dial it back. She did give me the first three numbers, but then, I imagine, like she suddenly thought, she says, 'I am sorry, I can't give you any more information.'

"Q. What numbers did the first three numbers correspond? A. CY4."

The respondent National, after the hearing, moved the Board to reopen the record to permit it to prove the mechanical impossibility of tracing a telephone call on a dial telephone in the manner described by Mrs. Sanders, and in support of that motion attached correspondence between its counsel and the Southern Bell Telephone and Telegraph Company culminating in a report by a company expert, Mr. G. D. Henderson, its District Traffic Manager as follows:

"I have read Mr. Constangy's letter and am returning it herewith.

"Under the circumstances outlined in this letter it would be impossible for an operator to identify the source of a call received by one dial subscriber from another dial subscriber after the connection has been broken."

The Counsel for the General Counsel responded with commendable candor to the motion to reopen the record in part as follows:

"The Regional Office has investigated the alleged impossibility of tracing a telephone call made over a dial system as set forth in the motion of Respondent National Paper Company, and it is admitted

that it is impossible for an operator to identify the source of a call received by one dial subscriber from another dial subscriber after the connection has been broken."

The Board, while denying the motion to reopen the record, considered the exhibits submitted with the motion as part of the evidence in the case, and stated that:

"In the light of the foregoing conflict between said exhibits and Sanders' testimony we have not credited Sanders' testimony on the Fier's incident or any other matter, except where it is corroborated by other credible evidence, or where it stands alone as the only testimony on a particular point and the Respondents, although having adequate opportunity to call other witnesses who might have rebutted such testimony, failed to do so."

The highly reprehensible misconduct charged against Fier, if actually committed, was without excuse or justification, but on the basis of this record we do not think it could properly be charged as an unfair labor practice to National. The testimony is undisputed that all such calls occurred at night when no responsible official or employee of respondent was present at the plant; that National never authorized or ratified any such misconduct, and in fact, that it was in direct violation of express orders of Fier's own employer, respondent Southern, which company alone had the power to hire and fire Fier, and was responsible to National for supervising and controlling him in the performance of his duties. It is going too far to hold an employer responsible for the unauthorized derelictions of an employee of an independent contractor.

Having absolved National from responsibility for the coercive conduct attributed to Fier, there exists no independent jurisdiction under the Act to enforce those provisions of the Board's order directed solely against respondent Southern and the individual Fier, for the Board's jurisdiction over these remaining respondents is derived from, and sustainable only under the theory of an agency relationship found to exist between them and respondent National, which this Court rejects as unwarranted by the record. See N. L. R. B. v. Russell Mfg. Co., 5 Cir., 187 F.2d 296.

### VI. Unreliability of the Examiner's Report.

Reverting now to our statement in connection with the Board's findings of interference and restraint that the Examiner's report and the Board's findings based thereon are not entitled to the usual presumption of correctness, we do not intend to reflect on the competency of the examiner on less provocative occasions. Jewell Sanders was not proved to have deliberately given false testimony until after the hearing closed. A careful comparison of the report with the evidence leaves us in no doubt that the examiner, relying on her testimony, was carried away with his justified wrath toward Fier, which he mistook for righteous indignation toward all of the respondents. We have heretofore called attention to the intemperate language of the report and to the Examiner's rejection of uncontradicted evidence for the respondent. This Court adheres to what was so well said for it by its present Chief Judge in N. L. R. B. v. Phelps, 136 F.2d 562, 563, 564:

"* * * a fair trial by an unbiased and non-partisan trier of the facts is of the essence of the adjudicatory process as well when the judging is done in an administrative proceeding by an administrative functionary as when it is done in a court by a judge. Indeed, if there is any difference, the rigidity of the requirement that the trier be impartial and unconcerned in the result applies more strictly to an administrative adjudication where many of the safeguards which have been thrown around court proceedings have, in the interest of expedition and a supposed administrative

efficiency been relaxed. Nor will the fact that an examination of the record shows that there was evidence which would support the judgment, at all save a trial from the charge of unfairness, for when the fault of bias and prejudice in a judge first rears its ugly head, its effect remains throughout the whole proceeding. Once partiality appears, and particularly when, though challenged, it is unrelieved against, it taints and vitiates all of the proceedings, and no judgment based upon them may stand."

See also, Local No. 3, United Packinghouse Workers of America v. N. L. R. B., 8 Cir., 210 F.2d 325, 329, 330.

█ For that reason, that part of the Board's order based on findings of interference and restraint in violation of Section 8(a) (1), along with all other parts, must be denied enforcement.

Enforcement denied.