**PEABODY COAL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 12886.

United States Court of Appeals
Seventh Circuit.

Sept. 2, 1960.

Howard P. Robinson, Chicago, Ill., William F. Guffey, Paul C. Zempel, V. Lee McMahon, St. Louis, Mo., for petitioner, Sidley, Austin, Burgess & Smith, Chicago, Ill., Guffey & McMahon, St. Louis, Mo., of counsel.

Stuart Rothman, Gen. Counsel, George Schatzki, Atty., Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Atty., National Labor Relations Board, Washington, D. C., for respondent.

Before DUFFY, MAJOR and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

Peabody Coal Company, petitioner, seeks to review and set aside order of the

National Labor Relations Board issued December 15, 1959 (125 NLRB No. 88). The Board, respondent, cross-petitions for enforcement of that order. The order issued on authority of § 10(c) of the N.L.R.B. Act, as amended (29 U.S.C.A. § 151 et seq.) and this Court has jurisdiction under § 10(e) and (f) of the Act.

Peabody is engaged in mining coal for sale in interstate commerce.

The Board found that Peabody threatened employees at its Astoria mine with reprisals for filing and handling grievances, and that Peabody implemented the threats some years later by discriminating against those who did file grievances, when Peabody was selecting production employees for its new mine at Pleasant View. The Board held that Peabody thereby violated § 8(a) (1) and (3) of the Act in interfering with, restraining, or coercing employees in the exercise of rights guaranteed them under the Act and in discrimination with regard to tenure etc., to discourage membership in any labor organization.

The consolidated Complaint alleged violations of the Act through threatening statements allegedly made by named supervisors and through discriminatory discharge of the fifteen charging parties. Peabody filed a motion for bill of particulars and motion for production of affidavits taken from probable witnesses. These were denied by the Trial Examiner.

The allegations of the consolidated Complaint were overly vague and general, consisting largely of conclusory statements. Typical allegations are:

"(a) On or about August,. 1957, and January, 1958, Jack Barding threatened employees with reprisals because they had engaged in union and/or concerted activities." [Supplemental Appendix, p. 12]

"(e) On or about September, 1957, W. H. Price told an employee that if he had not previously engaged in union and/or concerted activities, the Respondent [Peabody] would not take reprisals against

him." [Supplemental Appendix, p. 13]

and

"VII. Respondent, [Peabody] by its officers, agents and supervisors, while engaged in the operation of its business described above, did discriminatorily discharge the employees named in Appendix 'A' attached hereto on or about the dates set forth opposite their names for the reason that they engaged in union or concerted activities for the purpose of collective bargaining or other mutual aid or protection and has at all times thereafter failed and refused to reinstate them to their former or substantially equivalent positions for the same reason." [Supplemental Appendix, pp. 13–14]

Peabody thus remained in ignorance of the specific things of which it was accused until the charging parties and other witnesses testified. We agree that a bill of particulars was in order, as the subsequent proceedings indicate that the allegations in the Complaint did not sufficiently advise Peabody of the nature of the violations charged.

The Board contends that ample notice was given, relying on American Newspaper Publishers Ass'n v. N. L. R. B., 7 Cir., 1951, 193 F.2d 782. In that case, this Court said (at page 800):

"All that is requisite in a valid complaint before the Board is that there be a plain statement of the things claimed to constitute an unfair labor practice that respondent may be put upon his defense."

Here nothing was said to indicate that the unfair labor practice charged consisted of failure to hire at a new mine, or that the union or concerted activities consisted of processing grievances.

In the American Newspaper case, the respondents asserted that they were charged only with "attempting" not "causing" discrimination, and that the Board could not, therefore, find that discrimination had been "caused." This Court held (at page 803) that an allega-

tion that respondents "attempted to cause and are attempting to cause" and setting out the means employed, was sufficient to put respondents on notice that they were also charged with having caused discrimination, and to enable them to defend against that charge.

The Board cites Lloyd A. Fry Roofing Co. v. N. L. R. B., 1 Cir., 1955, 222 F.2d 938, 940, for the proposition that it was necessary for the Complaint only to set out the approximate dates and the names of the perpetrators of the alleged violations. In the Fry case, the Court did say that it was sufficient to inform the petitioner of the month in which the alleged questioning and threatening of employees concerning union activities had occurred and that the general superintendent and assistant general superintendent were the officials who took part in the violations. Unlike the case before us, however, Fry involved only two charging parties and these two had in fact been discharged from a going concern. In N. L. R. B. v. S. W. Evans & Son, 3 Cir., 1950, 181 F.2d 427, to which our attention is also invited by the Board, the Court noted (at page 431) that the complaint there stated with reasonable specificity, in seven sub-paragraphs, the nature of the violations allegedly committed during the period from November, 1946, to January 19, 1948. Evans sought particulars with respect to the names of those who allegedly committed the unfair labor practices and the approximate times thereof. The Trial Examiner required answer to the first request only. On appeal, it was undisputed that there was substantial evidence to support the Board's findings. The Intermediate Report in that case, (81 N.L.R.B. 164) describes some sections of the Complaint as follows (at p. 169):

> "Paragraph 8, subdivision F, of the complaint alleges that the Respondent violated Section 7 of the Act in that it engaged in conduct and statements on the day of the election to influence employees not to vote in the said election."

and (at p. 170):

> "Paragraph 8, subdivision G, of the complaint alleges that the Respondent violated Section 7 of the Act in that it posted a notice to its employees derogating the Union's status as exclusive bargaining representative. The notice reads as follows: * * *"

These, it will be seen, are far more specific and informative than the allegations of the Complaint in the instant case. The Court in the Evans case held that examination of the record failed to reveal that any prejudice of a measurable degree accrued to the respondent from the ruling complained of.

It does appear that in the case before us, at the conclusion of each witness's testimony, the General Counsel made available to Peabody such pretrial statements of such witness as were in the General Counsel's possession. Besides depriving Peabody of statements of persons not called as witnesses by the General Counsel, Peabody contends that this procedure resulted in lack of due process by denial of adequate time to prepare to meet the charges. However, apart from renewing its aforesaid motions at the commencement of the hearing, it does not appear that Peabody requested and was denied appropriate continuances in the course of the hearing or at the conclusion of the General Counsel's case.

We cannot agree that Peabody was denied a fair hearing and due process of law by virtue of the denial of its motion for particulars.

Peabody's Astoria mine in Fulton County, Illinois, began processing coal in 1951, and continued to do so until December 13, 1957, after which production at Astoria proper shut down. Construction began at a new mine in Pleasant View, Schuyler County, Illinois, in August, 1957. Full time processing began February 13, 1958. From April, 1957, until January 31, 1958, Peabody was extracting coal from a pit at Camp Ellis, Fulton County, Illinois, which had about a one-year life expectancy. As production decreased at Astoria, many employees were transferred to Camp Ellis

or hired for construction work at Pleasant View. The Board found that the more experienced and senior employees, including the fifteen charging parties, went to Camp Ellis where they continued to perform production work at higher rates of pay than they would have earned on the construction work then being done at Pleasant View.

The Intermediate Report states:

"There is no contention herein that the charging parties should have been sent to do the construction work at Pleasant View and no contention that Respondent [Peabody] violated the Act by sending the charging parties to Camp Ellis. However, it does appear to be the contention of the General Counsel that the prevailing circumstances— the simultaneous opening of a production site (Camp Ellis) and of a construction site (Pleasant View) afforded Respondent an opportunity to move, lawfully, its more senior and more union minded employees to a site having a limited production expectancy and its less senior and less aggressive employees to a site having a long production expectancy once it got into production and that Respondent capitalized upon his opportunity when Pleasant View production operations began." [Joint Appendix, p. 20]

Nevertheless, the Board now contends that a transfer to the lower paid construction work at Pleasant View was considered by the employees to be more desirable than transfer to the higher paid production work at Camp Ellis because of the comparative life expectancies of the two sites.

One of the charging parties, Richard Stambaugh, (Joint Appendix, pp. 303–5) left Camp Ellis about August 1, 1957, when "bumped" off his job there by another charging party, Mr. Phillips, and returned to Astoria where he worked until January 13, 1958. Then he was hired to do construction work at Pleasant View until March 5, 1958. He was recalled to do dismantling work at Astoria from about June 30, 1958, to the middle of July, 1958. (Joint Appendix, p. 321) He testified that he was called back to Pleasant View for construction work in the fall of 1958. He stated first that this was in October or November and ran to the latter part of November, but corrected that on cross-examination as being from August to the latter part of October. None of the other charging parties worked at Pleasant View.

It does not appear that any of the charging parties requested construction jobs at Pleasant View while on production work at Camp Ellis, even after hearing the warnings, to which they testified, of short term employment there. Lester Phillips, one of the charging parties, stated (Joint Appendix, p. 163):

"Well, sir, I was on production and it just isn't done for a man to bump from a production job to a construction job. For one thing it's less pay and it's not as steady a work, so it just isn't done. But I was older in seniority than the man that was put on there as second shift ground man, which I was, so when this machine went into operation, I should have been allowed my seniority rights with the company to bump into that job."

When Pleasant View was ready for production, the employees for production were chosen from the approximately one hundred twenty employees who had been doing the construction work. The names of the other construction workers were placed on a panel from which future production employees would be selected as needed. The Board argues that Peabody could have hired any of the charging parties for construction and thus qualified them for production work. One of the charging parties, Mr. Stambaugh, as indicated, was hired for construction but was not selected to remain as a production worker. The Intermediate Report states that Peabody was not obliged to select its production workers from those who had previously done the construction work, but that this was not an unusual procedure. It was apparently

followed at the Astoria mine. Mr. Stambaugh, for example, testifying about his initial employment at the old Astoria mine, said (Joint Appendix, p. 299):

"I started on construction as everybody else."

This was corroborated by other charging parties. Once they were chosen for production work, the seniority of production workers ran from the date they were hired for construction, although they were not chosen for the initial production crew in the order of that seniority.

The evidence to which the Board points to prove that Peabody was not obliged to follow this procedure of selecting production from construction employees (Joint Appendix, pp. 747, 755) deals with Mr. Imlay's testimony, on cross-examination, to the effect that Peabody could in the first instance select production crew members from among the construction panel regardless of seniority and could hire a man outside that panel if there were no men on the panel qualified for a specific job. He stated that only one such outside man had been engaged. However, on redirect examination, he testified further regarding the specific work which this man was hired to do, and it appeared that the work was of a construction rather than a production nature. (Joint Appendix, p. 784) The evidence indicated that Peabody had a continuing problem of keeping the old mine at Astoria and Camp Ellis going and maintaining a sufficient crew there while it was setting up the new mine at Pleasant View.

The charging parties originally contended that their seniority rights from the old mine at Astoria carried over to the new mine at Pleasant View, and appealed on that basis to their own Union. After a full hearing at which opportunity was given to submit such evidence as desired in support of the appeals, the Union found that Pleasant View was a new mine and that seniority rights acquired at Astoria did not apply. The Board does not take issue with that finding by the Union. The Board concluded, however, that although not obliged to hire the charging parties at the new mine, Peabody had really failed to hire them for production jobs at Pleasant View, when Camp Ellis jobs were ending, because the charging parties had all been active in processing grievances at the Astoria mine, pursuant to the collective bargaining contract between Peabody and the Local of the United Mine Workers which was the bargaining representative of Peabody's employees at Astoria and Camp Ellis.

The threats are attributed to supervisory employees Claud Reed, Paul Simmler, Jack Barding, William Imlay, W. H. Price, and William V. Hartman. With the exception of Mr. Price, who had died prior to the service of the charges on Peabody, these supervisory employees in their testimony denied the threatening statements attributed to them.

Lester Phillips testified that as a member of the pit committee from 1950 to 1956 he had filed grievances for himself and others. He described some of these as filed in 1952, 1954, and 1955. Mr. Phillips had started at Astoria by working a year on construction. He testified that on the first day he arrived at Camp Ellis, August 1, 1957, he was greeted by supervisor Jack Barding with the statement:

"Welcome to the vines; it looks like you're hung on the vine too."

and that Mr. Barding later told him Peabody would hire only men who "hadn't made any grievances or anything; * * *" (Joint Appendix, p. 125) On cross-examination, he explained that on January 31, 1958, he had been told by Mr. Barding (Joint Appendix, p. 136) that the Camp Ellis mine was to be shut down and all men laid off. At that time, Mr. Phillips had stated that he would make a claim, based on his seniority, for the job held by one Mike Harber at Pleasant View, whom he regarded as less qualified than himself (Joint Appendix, p. 148). He testified that back in August, 1957, Mr. Barding had told him that Mike Harber had been "picked to be the second shift ground man on the fifty-five sixty at Pleasant View, and it looked

like [Mr. Phillips] had lost [his] job." (Joint Appendix, pp. 139–140) Mr. Phillips testified that he had heard the phrase "hung on the vine to die", about Camp Ellis back in June or July, 1957. (Joint Appendix, pp. 143–4.)

Mr. Phillips also testified (Joint Appendix, p. 122) that on January 10, 1958, at Pleasant View, he spoke to Superintendent William Imlay who told him he had no job for Mr. Phillips because:

"Ever since you took up this case * * * back in 1952 they've never forgot it—that decision has been laying on that desk for five years— for you to get laid off. I couldn't put you to work if I wanted to."

Mr. Phillips testified further that Mr. Barding later discussed the matter with him and had said of this incident in 1952 (Joint Appendix, p. 123) that Bill Imlay had never got over it, that there was a record kept of it. Mr. Phillips stated that no one else was present when these conversations took place with Mr. Imlay and Mr. Barding, both of whom denied having made the statements attributed to them. For example, Mr. Barding testified that he had asked Mr. Phillips (Joint Appendix, pp. 674–675) about some "wild tales circulated about the pits" to the effect that Mr. Phillips "had sued the company and United Mine Workers" and that Mr. Phillips had explained that this referred to a complaint filed with the National Labor Board. In this Mr. Barding corroborated Mr. Phillips' testimony, but his account of the remainder of the conversation differed sharply. Mr. Barding said that Mr. Phillips had taken time off to attend to this matter, and Mr. Barding had asked that he be notified if Mr. Phillips were going to be off in the future so that he could get a replacement. Mr. Imlay testified that when Mr. Phillips asked him for a job early in 1958, Mr. Imlay had told him that he had all the men he needed and that all the men that went on production would be selected out of the construction crew, that he said nothing about past grievances or the attitude of

Peabody's St. Louis office toward them. (Joint Appendix, pp. 723–724)

Clell Price testified that he started at Astoria on construction work May 13, 1948, having had twenty-five years of experience in mining (Joint Appendix, p. 433), that he went to Camp Ellis August 1, 1957. (Joint Appendix, p. 434) He described a number of grievances he had handled in 1952, 1953 and 1954. (Joint Appendix, pp. 445–6). He testified to a conversation with Mr. Imlay (Joint Appendix, pp. 465–6) in 1953 or 1954 when Mr. Imlay said that Mr. Price would regret having made a motion, at a Union meeting, to shut down the mine for three days at Christmas time. Mr. Imlay (Joint Appendix, p. 716) remembered no such conversation.

Mr. Price testified that in 1956, Mr. Barding had made the threat that:

"You know that all you guys that's took up grievances against this company, caused hell, is not going over to Pleasant View?" [Joint Appendix, pp. 436–7]

and that in 1957, Mr. Imlay said:

"You ain't going to Pleasant View." [Joint Appendix, p. 437]

The conversation with Mr. Barding was described as occurring in the spring of 1956, when there was a lot of water in the pit, (Joint Appendix, p. 451) when there was trouble getting the water out, and it was necessary to use a boat in the pit itself. (Joint Appendix, p. 436) Mr. Price said that Mr. Barding had come up to him (Joint Appendix, p. 453) and, without any preamble, had made the quoted statement, to which Mr. Price had made no reply. He testified that at another time, in 1956, when Mr. Price was driving to work, Mr. Barding had flagged him down, drawn his own automobile alongside Mr. Price's, to say that when he had fired one Vern Antry (who was not known to have filed any grievances) for refusing to do some work (Joint Appendix, pp. 455–456) the truck drivers had refused to haul coal. Mr. Price testified that Mr. Barding then said:

" \* \* \* you know damn well we're going to Pleasant View and you guys raised all this trouble, taking up all these grievances, are not going." [Joint Appendix, p. 437]

Mr. Barding testified that he had not fired Mr. Antry, but had temporarily replaced him with another employee during the period Mr. Antry had refused to carry on a particular job, and that the truck drivers refused to continue until he explained that he had not taken Mr. Antry off the job and was willing for him to resume; whereupon both Mr. Antry and the truck drivers returned to work. (Joint Appendix, pp. 670–671) Mr. Barding denied making the quoted statements and also denied Mr. Price's testimony that Mr. Barding and Mr. Price frequently discussed working conditions and employee demands. Mr. Barding testified that for months at a time Mr. Price did not speak to him at all.

The statement attributed to Mr. Imlay was described as occurring at Astoria between January and April, 1957, (Joint Appendix, p. 457) when Mr. Imlay was coming away from the drag line machine and Mr. Price was going toward it. Mr. Price had asked, he said:

"When are we going to Pleasant View?" [Joint Appendix, p. 458]

and Mr. Imlay had replied:

"You ain't going to Pleasant View,"

and had gone on without answering the further question:

"Why not?"

When the second shift was shut off at Astoria, Mr. Price had gone to Camp Ellis by exercising his seniority to "bump" another employee who was there. (Joint Appendix, p. 459) In January, 1958, (Joint Appendix, p. 460) Mr. Price had seen Mr. Imlay at Pleasant View and demanded a job on the basis of his seniority at Astoria. He testified that Mr. Imlay had told him he had no rights there, that it was a new mine. In Mr. Price's opinion (Joint Appendix, p. 461) this was wrong; it was not a new mine. He continued to assert that opinion at the hearing.

Raymond Joe King testified that he started at the Astoria mine doing construction work in July, 1948, and continued there until October, 1950, (Joint Appendix, p. 186) when he was laid off. He was called back on production work in June or July, 1951, after he talked to Mr. William H. Price, now deceased, about a job. (Joint Appendix, p. 187) He testified that he processed grievances for himself and for others as a member of the pit committee; that in February, 1955, Mr. King had claimed a particular job operating a coal drill, which was a better job than the truck driving job he had. He stated that there were several men doing this work but that no one was "classified" on it. Mr. King testified to a meeting with the pit committee, Mr. Imlay, a Mr. Beasley who was the Board member representing the miners, and a Mr. Nowers, who was not identified by Mr. King. (Joint Appendix, pp. 169–170) He quoted Mr. Imlay, as saying in the course of the conversation:

"I can get all this work done on nights. \* \* \* I've been getting it done on days; we're paying men higher rate for the work and I don't need it done at night; I got a man there I can get; I don't have to classify a man. \* \* \* King's always raising hell and claiming this job and that one. \* \* \* I'm not about to give it to him. \* \* \*"

and then to Mr. King:

" \* \* \* one of these days you're going to regret this. \* \* \*"

Mr. Imlay testified (Joint Appendix, p. 726) that he was sure he did not make this statement.

In August, 1957, Mr. King stated he spoke to Mr. William H. Price, supervisor of another Peabody mine. On cross-examination, there was some question as to whether this conversation occurred in September, 1958, but that was found to be impossible because Mr. Price was dead by then. (Joint Appendix, p. 205) Mr. King stated then that the conversa-

tion occurred in September, 1957. Mr. King testified that he lunched with Mr. Price and Mr. Price's assistant (Joint Appendix, pp. 175–176) but waited to get Mr. Price alone to ask him for a job. (Joint Appendix, p. 202) Mr. Price, Mr. King stated, then told Mr. King:

> " * * * when a man takes another employee from another mine, * * * I have to clear that through St. Louis and with superintendent that's over the construction where you're working * * * report come back on you that you were raising all kinds of hell up there. * * * I can't use you." (Joint Appendix, pp. 175–176)

Mr. King testified that after this conversation with Mr. Price, he asked Paul Simmler, the assistant superintendent at Astoria, whether Mr. Simmler had blackballed him (Joint Appendix, pp. 176–177) and Mr. Simmler had said "no" but when asked for an opinion, answered:

> "I don't know but just taking a wild guess I'd say it was Mr. Don Johnston. * * * You know the time you tried to get Mr. Reed fired * * * the company didn't like that very well * * * "

Mr. Simmler testified that Mr. King came in and said he had been to see Mr. Price about a job at River King mine but didn't know yet how he came out. He asked if Mr. Price had called Mr. Simmler and Mr. Simmler had said no, he had not. He denied any further conversation. (Joint Appendix, p. 610) Mr. King explained that in 1953 he and others processed a grievance asking for dismissal of Claud Reed, tipple foreman (Joint Appendix, p. 177). Mr. King, on cross-examination (Joint Appendix, pp. 203–4) stated that he had then called Don Johnston, vice-president of Peabody (who had general supervision over about twenty-nine strip mines) (Joint Appendix, p. 210) at his home on the following Sunday morning, but that Mr. Johnston knew nothing about any procedure for clear-through the St. Louis office. Mr. Johnston had also told Mr. King that he

had not "blackballed" Mr. King. Mr. Johnston had then referred Mr. King to Mr. Hartman. (Joint Appendix, p. 204)

In the summer of 1957, Mr. King testified (Joint Appendix, pp. 183–184) he saw Claud Reed at the dock used by Pleasant View in Havana, Illinois, and that he spoke about coming to work at that dock, whereupon Mr. Reed had said:

> "You're not going down to Pleasant View * * * you know you tried to get my job one time; I've never forgot it; Bill Imlay's never forgot it; company's never forgot it."

The petition to dismiss Mr. Reed was written in 1952 or 1953. (Joint Appendix, p. 223) During the intervening years, Mr. King testified (Joint Appendix, p. 224) he had seen Mr. Reed every day and had worked with Mr. Reed, who "treated me like a gentleman, and he was a pleasure to work for."

Mr. King explained that he had not included this incident in his two statements to the N.L.R.B. field examiner (Joint Appendix, p. 225) because he did not think of it at those times.

The petition for dismissal of Mr. Reed (Peabody's Exhibit 6) was signed by thirteen employees, Mr. King having signed as a member and as president of the Union local. Six of the signers were later employed at Pleasant View; Steve Perardi, Burl Lancaster, William Wilson, James Miller (Joint Appendix, p. 842) Richard Stambaugh, and Samuel Cassel. (Joint Appendix, p. 843) At the time of the hearing before the Trial Examiner, Steve Perardi, William Wilson (Joint Appendix, p. 733) Burl Lancaster, and Samuel Cassel (Joint Appendix p. 734) were still employed, and Richard Stambaugh and James Miller (Joint Appendix, p. 734) were on the panel from which future employees would be drawn.

Mr. Reed testified (Joint Appendix, p. 602) that he had never seen the petition or the names of the persons who signed it. He denied discussing it with any employees and specifically (Joint Appendix, p. 603) denied the statements attributed

to him by Mr. King. He testified further that he hired no employees and had nothing to do with hiring for Pleasant View.

Mr. King testified further to another conversation with Mr. Imlay which occurred a few days after the conversation with Mr. Simmler in the late summer of 1957 (Joint Appendix, p. 177) in front of the police station in Havana, Illinois. Mr. Imlay and a Barney Kahn were sitting in the front seat of Mr. Imlay's automobile. Mr. Kahn was a businessman in Havana. (Joint Appendix, p. 212) Mr. King said that he got into the back seat of the automobile and (Joint Appendix, p. 178) told Mr. Imlay:

"I was down to River King Mine to find out why I couldn't go to work * * * and the word come back that you'd caused me to get blackballed down there and I'd like to know the reason why * * *"

to which he quoted Mr. Imlay as replying:

"King, everything you've ever done the last six years is on Merle Kelce's desk and they've just been waiting to get even with you."

Mr. Kelce was president of Peabody.

Mr. Imlay testified that this conversation occurred in front of the City Hall (Joint Appendix, p. 776); that Mr. King had spoken to him about a job and that Mr. Imlay had told him that it was a long time off before any move would be made and that Peabody expected to go into production in the new mine a year later; and that Mr. King then got out of the automobile without further discussion. (Joint Appendix, p. 727)

Mr. Kahn testified that he was in the front seat of the automobile with Mr. Imlay; that as the automobile slowed down going by the City Hall, Mr. King had jumped into the back seat and had leaned over it talking to Mr. Imlay, so that Mr. Kahn had heard the whole conversation. Mr. Kahn testified that he heard Mr. King telling Mr. Imlay about having been in St. Louis at the River King mine and asking about a job in the new mine, and he heard Mr. Imlay say

that it was a long ways off. He heard no such statements as attributed to Mr. Imlay by Mr. King. (Joint Appendix, pp. 693–4)

Mr. Kahn could not remember precisely what Mr. King said at first because he was startled at seeing him in the back of the automobile. He did remember that the first remarks dealt with a hearing about closing a road and that then Mr. King said he had been at St. Louis and asked about a job. (Joint Appendix, pp. 697–700) Mr. Imlay also testified (Joint Appendix, p. 778) that the first part of the conversation dealt with a counsel meeting on use of a road.

Mr. King testified that he had not notified the Union officials that he was being blackballed because he thought they would know. (Joint Appendix, p. 228)

He testified to another incident (Joint Appendix, pp. 178–9) in January, 1958. He said that Mr. Simmler had called him and directed him to report to Camp Ellis as oiler on the loader for the second shift. Mr. King had argued that his seniority entitled him to a first shift job, but he had gone to Camp Ellis anyway, where he met Mr. Barding who had greeted him with the words:

"I guess you know you're up here, going to die on the vine like the rest of us undesirables * * *"

and, later:

" * * * you know that old man has never forgotten all the cases you guys handled against him, especially you. * * *"

Mr. King testified on cross-examination (Joint Appendix, p. 214) that "old man" meant Mr. Imlay.

Mr. King testified to having gone to Mr. Hartman's office (Joint Appendix, pp. 179–180) [he set the date as February 1, 1958, (Joint Appendix, p. 216)] in St. Louis where Mr. King told Mr. Hartman:

" * * * you don't know me from Adam so I'll give you a quick rundown on who I am. * * *"

Mr. Hartman was general superintendent and as such had supervision over Astoria and Camp Ellis. (Joint Appendix, p. 217) Mr. Hartman was quoted as saying that he had heard from Camp Ellis that operations there were shut down. Mr. King had then told Mr. Hartman about contacting some people to talk to Mr. Hartman on Mr. King's behalf. Mr. Hartman had then said both of these persons had spoken to him, but Mr. Hartman would not recommend Mr. King for a job, Mr. Hartman didn't know, but suggested talking to Mr. Imlay. Mr. Hartman was quoted by Mr. King as saying:

"* * * if you haven't done anything to cause us trouble or grief, you haven't got anything to worry about. * * *"

but also:

"* * * Frankly I think it's kind of late in the game." [Joint Appendix, p. 180]

Mr. King then went on to say that he had seen Mr. Imlay on February 3, 1958. (Joint Appendix, p. 218) He quoted Mr. Imlay as saying:

"King, I've got my crew all picked * * * how would you feel if you went over there and took somebody else's job?" [Joint Appendix, p. 181]

Later (Joint Appendix, p. 218) Mr. King said that Mr. Imlay had agreed to talk to Mr. Hartman about a job for Mr. King although Mr. King had previously testified that Mr. Hartman told him (Joint Appendix, p. 180) that Mr. Imlay was doing the hiring.

We have described these few typical segments of the evidence in some detail in order to indicate the nature and type of the multitudinous issues of fact which turned on the credibility of the witnesses.

With scant and insignificant exception, the Trial Examiner, whose findings were adopted by the Board, found the charging parties' evidence to be credible whenever it conflicted with that of Peabody's witnesses. In almost no case were there witnesses to the making of the statements alleged by the charging parties, and denied by those to whom the statements were imputed. One exception was the conversation between Mr. King and Mr. Imlay in Havana, Illinois, in 1957.

Another exception was the conversation between Mr. Stambaugh and Mr. Reed about March 12, 1958, in a tavern at Rushville, Illinois. (Joint Appendix, pp. 316, 324) Mr. Stambaugh testified that Sam Cassel, another Peabody employee, was present, and that Mr. Reed said the reason Mr. Stambaugh "didn't get a job at Pleasant View was on account of I had caused too much trouble." (Joint Appendix, p. 317)

Mr. Stambaugh had been hired at Pleasant View on two occasions to do construction work but had not been selected for production.

Mr. Stambaugh did not ask what was meant by the phrase "causing trouble" which he quoted Mr. Reed as using. He testified that he assumed the reference was to past grievances. Similarly other witnesses, who testified to such phrases as "raising hell," also assumed without asking that the phrase meant processing grievances.

Mr. Cassel testified (Joint Appendix, pp. 659–666) that he was present, as Mr. Stambaugh testified, to a conversation between Mr. Reed and Mr. Stambaugh in Rushville, but remembered no such statement being made. He at first put the date of the conversation as January 19, 1958, but on further examination testified to another occasion in March, 1958, when he was in the tavern and Mr. Reed and Mr. Stambaugh came in together. He remembered no talk at all about Mr. Stambaugh getting a job.

The Trial Examiner found Mr. Cassel's testimony to be too uncertain to be of any real value in determining credibility. (Joint Appendix, p. 30)

Peabody contends that Mr. Kahn was a disinterested local businessman, and that his testimony corroborating that of Mr. Imlay and contradicting that of Mr. King ought not to have been disregard-

ed. The Trial Examiner, however, concluded that Mr. Kahn was not a disinterested witness because he sold steel supplies to Peabody and bought scrap from Peabody, dealt with Mr. Imlay as a representative of Peabody, and was a personal friend of Mr. Imlay.

As Peabody points out, Pleasant View did not open for production until February, 1958, and Mr. Imlay's statement as corroborated by Mr. Kahn was in accord with the facts. The Trial Examiner, on the other hand, considered it discredited (Joint Appendix, p. 25) in the light of the entire record and thought Mr. King's version of the event was more probable than the other versions.

Both Peabody and the Board discuss the use of the expression "dying on the vine." The charging parties testified to its common use. The supervisory employees denied using it or hearing it used. Employee witnesses other than the charging parties made no reference to this expression. Even one of the charging parties, Richard Stambaugh (Joint Appendix, p. 322–323) testified that he first heard it in July, 1957. He attributed its use to Mr. Barding who denied using the term. Mr. Stambaugh testified further that he didn't ask the meaning of the term but assumed it meant the Camp Ellis work marked the end of the job.

Almost all the grievances involved were presented orally so that no record would have been maintained. They would have to have been remembered by the supervisors. Very few were written up and fewer still were included in the Bulletin of mine news which was distributed to employees and supervisors. Some were concerned with very small matters, e. g., six cents to be paid in lieu of a flashlight battery. The Trial Examiner, however, found that the grievances were known to and remembered by the supervisors and officials of Peabody.

Not all the grievances were minor and unrecorded. For example, James Briney (Joint Appendix, p. 496) testified that after he demanded a third shift fireman's job in 1953, there was a publication in the Bulletin which established the date of his seniority. Thus this case differs from N. L. R. B. v. Sheboygan Chair Co., 7 Cir., 1942, 125 F.2d 436, cited by Peabody, where this Court found "not one scintilla of evidence" that Sheboygan's officials knew the discharged employee had belonged to the union, and where there was an abundance of undisputed evidence, including that of the discharged employee, that the employee was discharged for repeated failure to perform his duties. The Trial Examiner had found no violation in Sheboygan, but the Board had reversed him. This Court denied enforcement of the Board's order.

The Trial Examiner in the case before us found generally that the witnesses for the charging parties and the General Counsel, rather than those for Peabody, should be credited as truthful witnesses. He also found their testimony not be self-conflicting and contradictory, while that of the Peabody witnesses did not appear to him to be as direct and forthright; he thought the Peabody witnesses were less than candid, evasive, argumentative, and in some cases contradictory of themselves and one another. No examples are stated in the report. On the basis of our study of the printed record, we cannot agree with these generalizations as a whole. The charging parties were explicit and consistent in their direct quotations of statements made to them by supervisory employees, but on cross-examination, they seemed less clear and specific about surrounding circumstances.

In one instance (Joint Appendix, p. 28) the Trial Examiner accepted Mr. Imlay's version over that given by Mr. King. Mr. King had testified that he went to see Mr. Imlay on February 3, 1958, (after he had seen Mr. Hartman) to ask him for a job at Pleasant View and Mr. Imlay had said that he did not want Mr. King at Pleasant View. Mr. Imlay testified that he told Mr. King prospects for a job at Pleasant View were slim because there were already enough men in construction work and the production workers would be selected from their

number. We cannot observe any feature of the conflict on this point to distinguish it from the numerous conflicts on other points to explain the Trial Examiner's dissimilar findings.

Peabody argues that the Trial Examiner credited fantastic statements, e. g. that back in 1956, in the midst of fighting a flood in the mine, Mr. Barding had come up to Mr. Price, and, without any reason, made the sudden declaration that men who filed grievances would not go to Pleasant View; or that the managing officials of twenty-nine mines would know about and remember numerous grievances filed over a period of years, with the express intent of securing a long delayed and subtle revenge. We must agree that these are surprising conclusions.

Peabody concedes that the general rule is that he who sees and hears the witnesses is best qualified to determine their credibility. But Peabody contends that this general rule applies only to exercise of this function with sound judgment and avoidance of arbitrary and capricious abuse of discretion, citing N. L. R. B. v. National Paper Co., 5 Cir., 1954, 216 F.2d 859. In that case there was evidence that while bargaining conferences were in process, a National superintendent had told two employees that they would already have had a raise but for the union, and guaranteed them jobs if they left the union; and another allegedly supervisory employee had told another employee it was fortunate he did not belong to the union or he would not have a job. The Board found that one employee was discharged for joining the union. There was a conflict of evidence on these matters. The Court held that the employer's knowledge of the union activity of the discharged employee (purportedly discharged for inefficiency) was based on pure inference and suspicion. The Court said (at pages 862–863) that the finding of discriminatory discharge was based on a pyramiding of several inferences which could not substitute for substantial evidence. The Court placed emphasis on the fact that one of the witnesses credited by the Examiner was

subsequently shown to have testified falsely, with respect to threats made to her over the telephone by one of National's watchmen. The telephone company later reported that dial calls could not have been traced as the witness testified these calls were traced. The Board conceded (at pages 867–868) the impossibility of the evidence of this witness and discredited her testimony on this point, but refused to reopen the record, considering this witness's testimony discredited except where corroborated by other credible evidence or where standing alone as the only testimony on a particular point and National, having adequate opportunity to call rebuttal witnesses, had failed to do so. The Court concluded that the Examiner, relying on this witness's testimony had been (at page 868) "carried away with his justified wrath * * *." Reference was made to his intemperate language and his rejection of uncontradicted evidence for National. Enforcement of the Board's order was denied.

National differs from the case before us in that the Trial Examiner's language cannot be called intemperate and the Board has made no such concession of false testimony as in National.

■ However, even if we do accept the Trial Examiner's somewhat startling findings of credibility, on the basis of his superior view of the witnesses, with respect to statements made by Peabody's supervisory employees, we cannot accept the conclusion that Peabody did discriminate against these fifteen charging parties. The practice of selecting production employees from those who had been construction workers was not only a common one in the industry, but had been followed in the Astoria mine. It is apparent that the charging parties made no attempt to secure construction work at Pleasant View. On the contrary, from their own testimony it appears that the charging parties would have resisted any attempts to substitute lower paid construction jobs at Pleasant View for the higher paid production work at Camp Ellis to which their sen-

iority rights entitled them. Perhaps the charging parties failed to seek construction work at Pleasant View because they held the erroneous opinion (which some of them asserted throughout the hearing before theTrial Examiner) that their Astoria seniority rights applied to Pleasant View. But they did exercise these rights to the fullest extent, some of them testified to "bumping" others of less seniority at Camp Ellis. Peabody merely allowed the charging parties to exercise their rights. If we agree with the Board that Peabody officials were harboring a long standing resentment of ancient grievances, then, to grant enforcement of the Board's order, we would also have to conclude that Peabody violated the Act in implementing its resentment merely by standing idly by and refraining from improper interference with the lawful exercise of seniority rights.

Mr. King testified that no claims based on discrimination because of grievances were filed until after Camp Ellis shut down. The two claims filed prior to that date concerned establishment of a union local at Pleasant View. Only when the field examiner came up to investigate those charges, were the charges before us, on which this case is based, filed.

The charging parties now demand that other employees (who took the lower paid construction jobs—thereby making themselves eligible for selection as production workers—and who, in fact, achieved such selection) should now be deprived of their reward by displacement in favor of the charging parties. The Board would support the charging parties in this demand. In oral argument before this Court, counsel for the Board likened the plight of such displaced Pleasant View employees to that of strike-breakers who are replaced by employees returning from a legitimate strike We do not see the analogy. The Pleasant View employees pursued the course of employment in construction work and then were selected for production. The charging parties elected not to seek such employment. They waited until production began and then demanded production jobs.

We find no evidence to support the conclusion that Peabody carried out its hiring program at Pleasant View with the purpose of punishing those who filed grievances at Astoria or of discouraging future filing of grievances at other mines.

We have not commented on all points and arguments presented by both sides, but have carefully considered them in arriving at this decision.

Enforcement of the board's order is denied.