## NATIONAL LABOR RELATIONS BOARD v. SHEBOYGAN CHAIR CO.

### No. 7835.

Circuit Court of Appeals, Seventh Circuit.

Feb. 4, 1942.

Robert B. Watts and John H. Dorsey, both of Washington, D. C., I. S. Dorfman, of Chicago, Ill., and Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Louis Libbin, and Thomas E. Shroyer, all of Washington, D. C., for National Labor Relations Board.

Herbert S. Humke, Paul L. Axel, John M. Poole, and Bassuener, Humke & Poole, all of Sheboygan, Wis., for respondent.

Before MAJOR and MINTON, Circuit Judges, and LINDLEY, District Judge.

MINTON, Circuit Judge.

The National Labor Relations Board seeks to enforce its order of July 21, 1941 against the respondent. In this order the Board found the respondent guilty of unfair labor practices in violation of Sections 8(1) and 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3). The trial examiner found there was no violation of the Act, and recommended dismissal of the complaint. The order affects the status of only one man, William Moegenburg. The Board entered a cease and desist order and provided that Moegenburg be reinstated with back pay. The only question presented is the sufficiency of the evidence to support the Board's findings.

The respondent manufactures chairs and tables at Sheboygan, Wisconsin. Efforts had been made in 1934, 1937 and 1939 to organize respondent's plant by the Furniture Workers and Finishers, Local 133-B of the Upholsterers International Union of North America, affiliated with the American Federation of Labor, hereinafter called the union.

After the efforts of 1939, an election was held on March 15, 1940 and the union was designated as the bargaining agent. An effort was made to negotiate a contract but no agreement was ever reached.

Immediately following the election, the union held a meeting. William Moegenburg, a fireman in respondent's plant, attended. He had formerly belonged to the union but had dropped out and had only recently rejoined. He complained at the union meeting about the firemen having to work seven days a week. The union took this up with the respondent, and the latter promptly arranged for the firemen to have one day off each week. There is no evidence that the respondent knew that Moegenburg had complained to the union or that he had attended the union meeting, or even that he was a union member.

While Moegenburg and another fireman were discussing the change in their working conditions with engineer Nelson, the plant superintendent, Hamilton, came up and according to Moegenburg, "bawled me out for squawking to other people and not coming to him."

The evidence showed without dispute that Moegenburg was always "squawking" and there is no evidence as to what particular "squawk" of Moengenburg Hamilton had reference to or what "other people" he had in mind. There is no evidence that Hamilton knew Moegenburg was a union man or that he had attended the union meeting or that he had made a complaint at such meeting. It was common knowledge among those who worked with Moegenburg that he was not only a "squawker" but that he did not do his share of the work and was generally very non-cooperative. The trial examiner who saw and heard Moegenburg testify stated in his findings: "The undersigned, from his observation of Moegenburg during this testimony, concludes that Moegenburg has a very definite non-cooperative attitude."

Moegenburg had been a fireman in the respondent's plant since February, 1934. He was discharged May 4, 1940, for the reason, as assigned by the respondent, that he had failed to perform his work properly.

As stated before, the undisputed evidence shows that Moegenburg was non-cooperative, that he did not do his share of the work and that he was always complaining to his fellow employees. He was a "trouble maker," as his fellow firemen characterized him. He would not even cooperate in the

affairs affecting the union that seeks now to protect him. On the day of the election for the purpose of determining the collective bargaining agent, Moegenburg was requested by his superior officer to come down and fire the boilers for a half-hour on that day to enable the other firemen to go vote, and he was promised pay for that half-hour. He said he was not interested in the union, he wanted to get his sleep, and he did not come down; but he had the effrontery to request the half-hour's pay for services he never rendered.

Nelson, the engineer, plainly became annoyed with Moegenburg, due to his non-cooperative attitude and his failure to perform his duties. It became so bad that Nelson said either Moegenburg must go or he would go. There is not the slightest evidence that Nelson's attitude was in the least influenced by Moegenburg's membership in, association with or activities in the union.

The climax was reached the day before his discharge, when Nelson gave Moegenburg eighteen boiler caps to clean. This job should have taken Moegenburg not more than twenty or thirty minutes to perform. Moegenburg, however, had on previous occasions said to his fellow firemen that this was not a fireman's job, to clean boiler caps. Before his shift ended, he had cleaned only four caps, although he had had ample time to clean all of them, and he left the balance for the fireman on the succeeding shift to clean. Nelson had been watching Moegenburg and knew he had shirked his work. Nelson called the superintendent, Hamilton, and asked that Moengenburg be discharged.

Even after the decision, when Nelson and Hamilton communicated the facts concerning Moegenburg's conduct to the personnel man, McNeill, who was also president of the company, the latter said: "Well, if that's the case, why don't you fire the man on account of this boiler cap business?"

In the meantime, Mr. Fred Braasch, active in the company's management, joined in the discussion relating to Moegenburg and said:

"Well, you don't know the man, Harry. The man has a wife and a family and he is buying a house, I think. You have got to think of those things."

"Surely," (McNeil said) "we have got to think of those things. If that's the case, it's just too bad, but that sort of thing Mr. Hamilton has been describing can't go on. No matter how kind hearted you are, if that's the case, as the engineer says, that the man isn't doing his work, that he was told to do it and don't do it, the only thing is to get rid of him."

The decision was to discharge Moegenburg because of his failure to do his work properly.

Notwithstanding this positive testimony that Moegenburg was non-cooperative, did not keep up his end of the work and had failed to clean the caps, as above outlined, and the positive testimony of the engineer, the superintendent, and the president of the company that Moegenburg was discharged because he failed to perform his work, and the fact that their testimony is not discredited in the least; and notwithstanding the fact that the trial examiner found there was no violation of the Act and he saw the witnesses and heard the testimony and found Moegenburg was non-cooperative, the Board found that because Moegenburg belonged to the union, attended a union meeting about two months before and complained to the union about having to work seven days a week, and during the discussion about the seven-day week, the superintendent, Hamilton, according to Moegenburg, "bawled me out for squawking to other people and not coming to him," the Board found that the respondent had thereby violated Sec. 8(1) of the Act and that the discharge of Moegenburg was because he had complained to the union and not to the company.

No other employees, union or otherwise, were discharged, and there had been only one or two discharges in the plant for any cause over a period of years.

The Board found this in face of the fact that Moegenburg himself testified that he was discharged because he had failed to clean the boiler caps as directed by Nelson. The following is Moegenburg's testimony:

"Q. So far as you know, they (meaning the respondent's officials) never knew that you were a member of the organization? A. I never spoke to them about it, no.

"Q. Then, how do you connect up the idea that you were fired because of union activities? I can't understand that. A. I didn't say that I was fired on account of union activities.

"Q. You don't claim that? A. No, because they told me right out I was fired because I didn't have the caps cleaned.

That's what Johnny Nelson told me that morning.

"Q. That is, your impression is that you were fired because of your failure to clean the caps? A. Yes.

"Q. Is that right? A. That's right.

"Q. And not because of union activities? A. No, sir."

* * * * *

"Q. Then you, yourself, don't believe that you were laid off there because of any union activities? A. No."

Moegenburg went to Braasch, and asked to get his job back. About that effort to get back his job, Moegenburg testified as follows:

"Q. You went to see Fred Braasch, didn't you? A. Yes.

"Q. Was there anything said about union activities that day? A. No, not a word.

"Q. You told him you were fired, didn't you? A. That's what Johnny Nelson told me. I told him what Johnny Nelson told me."

* * * * *

"Q. At least, you and Mr. Fred Braasch didn't get very far with Mr. Nelson, did you, in your efforts to get him to take you back again; is that right? A. Yes, that's right.

"Q. And Mr. Nelson was the engineer there, and he was your immediate boss? A. Yes."

We think the Board was unwarranted in its conclusions based upon an inference drawn from the fact that Moegenburg belonged to the union, attended a union meeting, there made a complaint, and during the adjustment of that complaint Moegenburg said Hamilton "bawled me out for squawking to other people." There is not one scintilla of evidence that Hamilton or any of the officials of the respondent knew that Moegenburg belonged to the union or that he had attended the meeting or knew about the complaint he had made at the meeting. There is no evidence as to who the "other people" were to whom Hamilton referred. There is an abundance of undisputed evidence that Moegenburg was a chronic "squawker" and "squawked" to his fellow workmen repeatedly.

■ When honorable men, wholly unimpeached, testify under oath to their reasons for discharging a man and such reasons are supported by all the evidence in the case and are not in any way connected with the discharged employee's union activities, the Board is not justified in discarding all of this evidence and finding the employer guilty of an unfair labor practice based upon a sequence of three or four unrelated events. Especially is this true when the employer had no knowledge of any of the events except one and the meaning of it was not established; and when the discharged employee testifies positively that he was not discharged because of union activities but because he had not done the work that had been given him to do, and thereby corroborates the contention of the employer.

■ Moegenburg was the only witness the Board had. The Board did not believe him or anyone else who testified directly in the case. It not only disregarded all the direct testimony in the case but also disregarded the trial examiner's findings and report, even though he had seen and heard all the witnesses and had made an adverse finding and observation as to the employee, Moegenburg. The Board should not discard the positive credible testimony of witnesses in favor of an inference drawn from tenuous circumstances that at best could have supported only an anemic suspicion. Such an inference does not meet the test of substantial evidence. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; Appalachian Electric Power Company v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989; National Labor Relations Board v. Norfolk Shipbuilding & Drydock Corporation, 4 Cir., 109 F.2d 128, 130; Martel Mills Corp. v. National Labor Relations Board, 4 Cir., 114 F.2d 624, 627, 628.

The petition for enforcement of the Board's order is denied.