**NATIONAL LABOR RELATIONS
BOARD**

v.

**PYNE MOLDING CORPORATION.**

**No. 84, Docket 23635.**

United States Court of Appeals
Second Circuit.

Argued Oct. 5, 1955.

Decided Oct. 28, 1955.

Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Provost, Asst. Gen. Counsel and Arnold Ordman and James A. Ryan, National Labor Relations Board, Washington, D. C., for petitioner.

Morgan P. Ames, Stamford, Conn., for respondent. W. H. F. Millar, Waynesville, N. C., of counsel.

Before CLARK, Chief Judge, and MEDINA and LUMBARD, Circuit Judges.

LUMBARD, Circuit Judge.

This petition to enforce an order of the National Labor Relations Board raises the question whether on the record as a whole there is substantial evidence to support the order, taking into consideration that the Board in finding against the Company overruled its Trial Examiner who had recommended dismissal of all three of the charges as to which enforcement is now sought. There is no question as to the Board's jurisdiction.

The Board found that the Pyne Molding Corporation had interfered with and coerced the production and maintenance employees at its New Milford, Connecticut plant in their rights of self-organization in violation of Sec. 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1); that employee Robert Essig had been discriminatorily discharged in violation of Sec. 8(a) (3) of the Act; and that the Company had refused to bargain collectively with the Union as required by Sec. 8(a) (5) of the Act. The Board agreed with the Trial Examiner's recommendation that a complaint of discriminatory discharge of five employees should be dismissed.

From an examination of the record as a whole and giving due weight to the findings and report of the Trial Examiner it is abundantly clear that the findings of the Board are supported by substantial evidence. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456. The basic facts are undisputed. The Board disagreed with the Trial Examiner only as to the inferences and conclusions to be drawn from those facts. The Trial Examiner concluded that the Company did not commit the acts complained of for the purpose of undermining the Union and discouraging membership in the Union, but that the Company had other and proper reasons for what it did. In reaching this conclusion he relied largely on the testimony of Robert Salusbury, the Company's manager, as to what his intentions were. The Board, on the other hand, drew contrary inferences from the undisputed facts. Although the Board may not overrule its Trial Examiner by discarding the positive credible testimony of a witness in favor of an inference drawn from tenuous circumstances, N. L. R. B. v. Sheboygan Chair Co., 7 Cir., 1942, 125 F.2d 436, it may refuse to follow its Trial Examiner in crediting testimony where it conflicts with well supported and obvious inferences from the rest of the record. Such refusal is particularly justified where the testimony in question is given by an interested witness and relates to his own motives. From an examination of the entire record we conclude that the Board was fully justified in reaching conclusions contrary to those of its Trial Examiner.

Coercion of the Employees in Violation of Sec. 8(a) (1)

In October 1952 the Company started the manufacture of moldings at its New Milford plant. On November 28, 1952 the Union commenced organizing the Company's production and maintenance employees and by December 9th ten of the thirteen employees had signed membership application cards authorizing the Union to act for them. On December 11th William Fernandes, the Union field representative, wrote the Company that the Union represented a majority of the employees of its production and maintenance departments and requested recognition of the Union and a meeting "at an early date for the purpose of bargaining collectively with respect to their wages, hours and other working conditions." This letter was received by the Company on Saturday, December 13th.

On Monday, December 15th, the Company's manager, Robert Salusbury, called employee Robert Essig into his office and

interrogated him as to the reasons for the employees' dissatisfaction with working conditions. Essig responded that the employees wanted an increase in wages and rest periods. According to Essig, Salusbury said to Essig "You know, it wouldn't be any good to have a union over here like they have over at Sandy Hook, conditions are bad over there because the union is in." This was not denied by Salusbury who significantly admitted on cross-examination that he mentioned conditions at Plastic Molding, a company at Sandy Hook, and that it was common knowledge that they had a union contract with the rubber workers' union. Salusbury told Essig he planned to make wage adjustments, set up rest periods, and inaugurate an insurance program and other benefits. Thereafter from December 17th to December 19th all of the other employees were called individually into Salusbury's office for talks similar to that with Essig. Salusbury told them that a wage increase would be granted after the first of the year, that machines for dispensing candy, cigarettes and soda would be installed, that windows would be screened and Venetian blinds would be obtained. On December 18th, the Company attorney, Mr. Miller, wrote the Union stating that the Company refused to recognize it as the collective bargaining agent stating that it was without knowledge as to whether the Union represented a majority of the production and maintenance employees. On Friday, December 19th, Essig was discharged by Salusbury.

Shortly after Salusbury's talks with the employees, the windows were screened and machines for dispensing cigarettes, candy and soda were installed. Pay increases were given to the employees within the next few days. The Company showed that it had applied to the Wage Stabilization Board for these increases on October 31, 1952, some weeks before any Union activity. In late November or early December the Company was unofficially notified that the application would be approved, but official approval was not sent until December 18th, three days after they had been announced to Essig. Thus the Company knew of the unofficial approval of the increases two weeks before it advised any of its employees.

On January 30, 1953 the Union filed a petition for an election. Six days later on February 5th the Company gave a 15 cents an hour wage increase to four employees. Later it announced that George Washington's Birthday would be a paid holiday. The Board on March 3rd directed an election. On March 11th and 12th employees were notified that there would be two weeks vacation after one year of employment, seven paid holidays a year, a Christmas Club, group insurance and two rest periods daily. Following this on March 31, 1953, the Union was permitted by the Board to withdraw its petition for an election. No election has been held.

The Trial Examiner was of the opinion that the Company's announcement of wage increases and other benefits was not made to prejudice the Union. Salusbury testified that his motives were otherwise. But the Board was amply justified in finding the contrary on all the evidence. The Board's conclusion that the Company's announcement of the wage increases and other benefits "was so timed as to show that its purpose was to interfere with the organization of its employees" and "* * * to thwart the organization of the employees when that organization had just been made evident by virtue of the Union's request for recognition," is amply supported by the Company's actions during the week of December 15th. Cf. N. L. R. B. v. Jamestown Sterling Corp., 2 Cir., 1954, 211 F.2d 725; N. L. R. B. v. Bailey Co., 6 Cir., 1950, 180 F.2d 278. Although the announcement of wage increases could have been made earlier, it was in fact delayed two weeks and was made immediately after receipt of the Union's letter and before official notice of approval. As to the February and March 1953 benefits, the Board observed that they were granted just before a prospective election and it was justified in concluding

that the granting of these later benefits was a continuation of the same course of illegal conduct embarked upon earlier to defeat the Union.

### Essig's Discharge in Violation of Sec. 8(a) (3)

 When Essig was discharged by Salusbury on December 19th he was told that his production had been low and that he had been lying down on the job. That was the first time any complaint had been made about Essig's work; Salusbury discharged him without even consulting the foreman in charge of production. Up to that time Essig had received two pay increases in three months and had taught new operators. Four days earlier he had been promised a further wage increase.

The Trial Examiner found that Essig was discharged not for union activity but because of the manner in which he performed his duties and his poor production. The Board rejected this finding and concluded that the Company knew or suspected that Essig was one of the Union leaders and discharged him because of such known or suspected activity. The undisputed facts set out above amply support this conclusion and are enough to outweigh Salusbury's claim that he discharged Essig because of poor production. The production records produced by the Company in support of the discharge are highly inconclusive and the Board was justified in finding that Essig's low production record was not the real reason for his discharge.

The Board's order provides that Essig be offered immediate and full reinstatement to his former or a substantially equivalent position and that he be made whole for any loss of pay calculated on what he would have earned from the date of discharge, December 19, 1952, to the date when he is offered reinstatement, less net earnings during such period. By amended order the Board excepted from such reimbursement period the time between the Intermediate Report of the Trial Examiner, August 14, 1953, and the Board's amended order of January 3, 1955. These orders appropriately provide for lost wages and should be enforced. The possible injustice to Essig of excluding a period of more than 16 months is one of the unfortunate concomitants of such an inexcusably long lapse of time from the Trial Examiner's report to final action by the Board, for which there is no explanation in the record before this Court.

### Failure to Bargain With the Union in Violation of Sec. 8(a) (5)

 If respondent's refusal to bargain on December 18th was not motivated by a genuine and reasonable doubt of the Union's majority, there was a violation of Sec. 8(a) (5). N. L. R. B. v. Everett Van Kleeck, 2 Cir., 1951, 189 F. 2d 516; Joy Silk Mills v. N. L. R. B., 1950, 87 U.S.App.D.C. 360, 185 F.2d 732, 741, certiorari denied, 1951, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350.

The Trial Examiner concluded that the Company's refusal to bargain was in good faith, largely because he found for the Company on the other charges.

The Board found that in refusing to recognize the Union the Company "acted not from a good faith doubt of the Union's majority, but out of a desire to gain time in which to destroy the Union's majority by unlawful means." The evidence amply supports this finding. The Company made no effort to determine whether the Union did in fact represent its employees. The individual talks with all the employees immediately after receipt of the Union's letter, the promising of wage increases and benefits, the discriminatory discharge of Essig, and the granting of wage increases and benefits, simultaneous with the Company's refusal to recognize the Union, make a consistent pattern which in our opinion permits only of the conclusion drawn by the Board that the Company played to gain time and used that time to dissipate the strength of the Union. The finding that the Company refused to bargain collectively with the Union in violation of Sec. 8(a) (5) of the Act is therefore well supported by the record.

The order of the Board, appropriate to the violations found, requires the Company to cease and desist from refusing to bargain collectively with the Union, from discouraging membership in the Union and from interfering with, restraining or coercing its employees in the exercise of their right to self-organization. The order further requires affirmatively that the Company, upon request, bargain collectively with the Union; that it offer to Robert Essig immediate and full reinstatement to his former or substantially equivalent position and that it post the usual notices at its New Milford, Connecticut plant.

As the proposed order is in every respect suitable to the violations, the petition for enforcement is granted in all respects.