NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ELIAS BROTHERS BIG BOY, INC., Respondent.

No. 15298.

United States Court of Appeals Sixth Circuit.

Feb. 12, 1964.

William J. Avrutis, N.L.R.B., Washington, D. C., Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Washington, D. C., on brief, for petitioner.

George Bashara, Detroit, Mich., George Bashara, Sr., Detroit, Mich., on brief, for respondent.

Before O'SULLIVAN, Acting Chief Judge, and CECIL and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge.

A union organizational campaign among the employees of the Elias Brothers Big Boy restaurants in the Detroit area was initiated in May and June 1961. Details of this campaign and the operations of respondent are recounted in the opinion of this Court in N. L. R. B. v. Elias Brothers Big Boy, Inc., et al., No. 15,180, 325 F.2d 360 (C.A.6), and will not be set forth herein except in relation to the specific questions here at issue. The present case arose out of this same unionization drive and involved employees in Elias' West Grand River Restaurant.[1]

The Board's decision and order are reported at 139 N.L.R.B. No. 99. A petition has been filed by the Board in this Court for enforcement of its order. The Board found that Elias interfered with, restrained and coerced certain employees and discriminated against employee Ann Maniscalco by discharging her because of her efforts to assist the Union in organizing other employees. Respondent was ordered to cease and desist from the unfair labor practices found, to offer Ann Maniscalco reinstatement with back pay plus interest, and to post the customary notices.

We grant enforcement in part and deny enforcement in part.

■■ The Board found that respondent, through actions of supervisory personnel, has interfered with, restrained and coerced its employees in the exercise of rights guaranteed in Section 7 of the Act and thereby violated Section 8(a) (1), 29 U.S.C. § 158(a) (1), in the following particulars: (1) by interrogating employees as to their union membership and sympathies, as to whether they had signed union cards and had attended union meetings and had mailed letters withdrawing from the Union; (2) in attempting to get employees to sign withdrawal letters and to mail them to the Union; and (3) in warning Ann Maniscalco that if the Union got in the employees "will probably lose the profit-sharing plan" and in telling her that the Company was good to the employees who were "loyal" to the Company and that more suitable working conditions might be arranged for her if she were for the Company instead of for the Union. These findings involve factual questions

---

[1] The charging Union is Local Joint Executive Board, Hotel and Restaurant Employees, Bartenders International Union, AFL-CIO, herein called "the Union."

Respondent, a Michigan Corporation, sometimes is referred to herein as "Elias" or "the Company."

for determination by the Board and are binding upon this Court if supported by substantial evidence on the record as a whole. United Fireworks Mfg. Co. v. N. L. R. B., 252 F.2d 428, 430 (C.A.6). We find substantial evidence to support these holdings and agree with the Board that the foregoing acts by supervisory personnel of the Company during a Union organizational drive under the facts and circumstances of this case constitute a violation of Section 8(a) (1) of the Act, 29 U.S.C. § 158(a) (1). N. L. R. B. v. Elias Brothers Big Boy, Inc., et al., 325 F.2d 360 (C.A.6), supra; N. L. R. B. v. Flemingsburg Mfg. Co., 300 F.2d 182 (C.A.6); N. L. R. B. v. United Biscuit Co. etc., 208 F.2d 52 (C.A.8).

We accordingly grant enforcement of this part of the order of the Board.

A far more difficult and serious question is presented by the findings of the Trial Examiner to the effect that Ann Maniscalco was discharged discriminatorily, by his rulings on the credibility of witnesses in this phase of the case and by the action of the Board in ordering respondent to offer to her immediate and full reinstatement with back pay.

The Company contends that no unfair labor practice was committed in the termination of the services of this waitress and that the Board was in error in ordering her reinstatement with back pay because: (1) Ann Maniscalco was an organizer for the Union who was "planted" in respondent's restaurant and was not a bona fide employee within the meaning of Section 2(3) of the Act, 29 U.S.C. § 152(3) and therefore she was not entitled to the protection of the Act; and (2) in any event this waitress gave notice that she was leaving and the Company therefore was justified in hiring a replacement for her.

Mrs. Maniscalco worked as a waitress for the Company for approximately five weeks, from June 28 to August 3, 1961. The Trial Examiner found that she "played the leading role in attempting to get the employees to sign union authorization cards" and described her as the "chief protagonist for the Union"; that she met Myra Wolfgang, secretary-treasurer of the Union, before applying for a job with Elias; that during the last three weeks of her employment by Elias "she was paid $15 a week by the Union to cover expenses for telephone calls to employees during her organizing efforts and gasoline used in her car in driving employees home from work at which time she would talk to them about the Union"; and that within a few days after the termination of her services as a waitress for Elias, "she became a fulltime paid organizer for the Union."

As for the credibility of this witness, the Trial Examiner found that: "Maniscalco was not a credible witness in certain respects, such as in connection with her prior employment, her attendance at business school, and about being permitted on occasion to check out a few hours early for the purpose of attending school."

Immediately after leaving the services of Elias, Mrs. Maniscalco became a fulltime paid organizer for the Union and was placed in active charge of the campaign to organize the employees of Elias. She was serving in that capacity at the time she testified as a witness before the Trial Examiner in this case. As an illustration of her activities, she testified that she had a mailing list of Elias employees and mailed out information bulletins and letters to them from time to time. After she had devoted her time and efforts, as a paid organizer for the Union, in directing the campaign to organize the employees of Elias from August 1961 to December 1961, her Union filed charges on December 4, 1961, to the effect that she had been discharged discriminatorily by Elias on August 3, 1961. At the time these charges were filed by her Union and at the time she testified in the proceeding, Mrs. Maniscalco continued in active charge of the unionization campaign.

Thus the record clearly shows that Mrs. Maniscalco was a highly interested and prejudiced witness against Elias, not

only because she was directing the unionization campaign, but also because she would be the beneficiary of back pay, if awarded. Nevertheless the General Counsel relied almost solely upon the testimony of this interested witness to prove the claim of an unfair labor practice regarding her separation from respondent's employ. The Trial Examiner credited her testimony and discredited the testimony of Company witnesses who contradicted her on the facts concerning the termination of her services as a waitress for Elias.

The employment application filed with Elias by this waitress stated that she was thirty-three years old, the mother of four children and separated from her husband. Her application showed no previous employment. The personnel manager for Elias testified that she told him when she applied for a job that she was a housewife with four children and had never been employed and that this was the first time she had to go out and work. Upon cross-examination, however, she admitted that she had held at least three previous jobs, including some previous experience as a waitress.

After several months of unemployment and "when I first realized I couldn't find a job," Mrs. Maniscalco said that she went to see Myra Wolfgang, secretary-treasurer of the Union. The Trial Examiner found that this "was the only time she saw her before her discharge." Mrs. Maniscalco testified that when she went to help prepare for picketing the Trenton Big Boy Restaurant in August of 1961, she called on Wolfgang for instructions. It is not clear from the record whether this occurred while she was working as a waitress for Elias or shortly after her services with Elias had been terminated. Her testimony on this point is as follows:

"I didn't know what to do, and I said, 'Will you wait here for fifteen minutes while I go call the office, call Myra Wolfgang, and see what she wants me to do' * * * and * * * I went out to a * * * public phone, and called Myra Wolf-

gang, and she said, 'Stay with them. I will send some people out. I will send someone out and look over the situation and help you.'"

She further admitted that Bob Caruthers, vice president of the local Union, introduced her to Yale Soifer, who was leading the Elias organization drive. She claimed, however, that "I don't recall if I met him before or after I came to work for Elias." She admitted that Soifer was the one who arranged for her to draw $15 per week from the Union while working for Elias, and that she invited Soifer to a meeting at her home to organize Elias employees.

Charles Anders, manager of the Elias Restaurant where this waitress worked, testified that during the latter part of July Mrs. Maniscalco told him: "Well, Chuck, I suppose you know that I have been working with the union by now"; that Anders inquired, "What do you mean you have been working with the Union?"; and that the waitress responded: "Well, it is our purpose and it is my purpose to be here to organize these other people into joining the Union." Mrs. Maniscalco denied making this statement, and the Trial Examiner credited her testimony and discredited Anders.

The second contention of the Company is that, even if Mrs. Maniscalco be treated as a bona fide employee, she gave notice that she was leaving, and therefore the Company was justified in finding a replacement for her.

Charles Anders, manager of the restaurant to which Mrs. Maniscalco was assigned, testified that on July 22, just before he was transferred to another restaurant for a few weeks, he told this waitress good-bye and said: "I will see you in two or three weeks"; that she replied: "Chuck, no you won't"; and that she said she had been working for the Union and was "going to stick it out and aggravate Bill and Mable [local manager and headwaitress] as much as possible * * * and that she would stick it out for a few more weeks, and then

call it quits."[2] Anders further testified that he telephoned William Miller, who served as manager of the restaurant while Anders was away, and told him to arrange for a replacement for Mrs. Maniscalco because she was leaving in two weeks. Miller verified that Anders told him this waitress was leaving in two weeks and testified that he told Bill Morgan, personnel manager for the Company, that she had given two weeks notice that she was leaving and that a replacement would be needed. Morgan confirmed the fact that he received this information from Miller or Anders and that he thereupon arranged a replacement. The replacement was a waitress named Jean Prewitt, who had previously worked for the Company and who at that time was on leave of absence.

Gerold Kargol, co-assistant manager for the restaurant, testified that this waitress told him about the middle of July that "she wouldn't be around any more, much longer," and that he told manager William Miller about this conversation.

Mrs. Maniscalco admitted that, when he delivered her final pay check, which included additional pay for a week in advance, Miller told her: "I hear you are leaving in two weeks, so we have a girl coming in the morning to take your place." She denied that she ever told anybody she was leaving in two weeks. She did admit that she told Anders that "you have been good to work under, and you have been fair, and I don't know if I will last two more weeks under this treatment without your being here."

■ On all the factual issues relating to the termination of the services of this waitress, the Trial Examiner credited her testimony, which largely was uncorroborated, and discredited the testimony of Company witnesses to the contrary. In considering these questions, we are met by the credibility rulings of the Trial Examiner. This Court repeat-

edly has recognized the general rule that questions of credibility of witnesses are for the Trial Examiner and that the Court will not disregard the superior advantages of the Examiner, who heard and saw the witnesses, for determining their credibility and for ascertaining the truth. Ohio Associated Telephone Co. v. N. L. R. B., 192 F.2d 664, 668 (C.A.6); N. L. R. B. v. Hamilton Plastic Molding Company, 312 F.2d 723 (C.A.6).

■ However, as said by the Supreme Court in Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 496, 71 S. Ct. 456, 468–469, 95 L.Ed. 456: "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. * * * The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case."

In the same case the Court said: "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. * * * Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." 340 U.S. at 488, 71 S.Ct. at 464–465, 95 L.Ed. 456.

In N. L. R. B. v. Pyne Molding Corporation, 226 F.2d 818, 819 (C.A.2), the Court said:

"Although the Board may not overrule its Trial Examiner by discarding the positive credible testimony of a witness in favor of an inference drawn from tenuous circumstances, N. L. R. B. v. Sheboygan Chair Co., 7 Cir., 1942, 125 F.2d 436,

2. At another point in his testimony, Anders said he signed a statement to the effect that Mrs. Maniscalco told him she was going to try to "stick it out for two weeks."

it may refuse to follow its Trial Examiner in crediting testimony where it conflicts with well supported and obvious inferences from the rest of the record. Such refusal is particularly justified where the testimony in question is given by an interested witness and relates to his own motives."

In a proper case this Court may decline to follow the action of an examiner in crediting and discrediting testimony, even though the Board has adopted the Examiner's findings. N. L. R. B. v. Florida Citrus Canners Cooperative, 288 F.2d 630 (C.A.5), rev. and reman., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, initial decision aff'd, 311 F.2d 541 (C.A.5).

As said by this Court in N. L. R. B. v. Oertel Brewing Co., 197 F.2d 59, 61–62 (C.A.6): "the credibility of the witnesses and the weight of the evidence was for the Board. Of course, the evidence upon which the Board bases its decision must be substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." In Cross Company v. N. L. R. B., 286 F.2d 799, 801 (C.A.6), this Court said: "But the Board is an Administrative Agency and not a court and while its judgments are entitled to great respect, evolving from wide experience, it is not infallible." See also Pittsburgh S. S. Co. v. N. L. R. B., 180 F.2d 731 (C.A.6), aff'd, 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479.

In the instant case the Trial Examiner has credited the testimony of a highly prejudiced and interested witness and discredited the testimony of all witnesses to the contrary. From August 1961 until the time of the hearings on March 5 to 7, 1962, this witness had been directly in charge of the campaign to organize the Company's employees. From June 28 to August 3, 1961, she had worked vigorously for the Union and had drawn $15 per week from the Union during three weeks of this period while employed as a waitress for the Company. She is the party who would benefit personally from the award of back pay recommended by the Examiner and ordered by the Board. The Trial Examiner found that she testified falsely upon three subjects, yet he credited her self-serving testimony on other subjects. She misrepresented the facts concerning her previous employment when she applied for a job with the Company, which was immediately after she had met with the secretary-treasurer of the Union. She said under oath that she went to business school on at least two evenings when she asked time off from Elias for that purpose, but a representative of the school testified that she had attended school a total of only three evenings in February, 1961 (four months before she started to work for Elias), and never came back, and that she never paid any tuition.

She testified that: "I had been more or less promised when I was first hired in that I would be able to get off early, that I wanted to go to school, to business school, and I had never been able to get off," but the Company records show that, during the five weeks she worked for Elias, she was granted permission to leave two hours early every Thursday evening, on three Tuesdays and on two Wednesdays. The manager of the restaurant testified that she was granted time off at her request upon her representation that she was attending business school.

Anders testified that, on one of the occasions when this waitress solicited his interest and support for the Union, "She told me she wasn't interested in belonging to this Union or anything about it because she was going to return to school in the fall, and that it wouldn't be of any use for her to join the Union, since she wouldn't be working there in the fall." Yet, the proof shows that while she was working for Elias she had applied for Union membership, was working enthusiastically to unionize the Elias restaurants and was paid "expense money" by the Union.

The testimony of Mrs. Maniscalco is vague and evasive on certain points. For example, although she testified with posi-

tiveness concerning many details of the case, she said she could not recall whether it was before or after she came to work for Elias that she met Yale Soifer, who arranged for her to be paid $15 per week by the Union and whom she succeeded as leader of the Elias organizational drive immediately after her services as waitress had been terminated.

The following is another example of evasiveness in her testimony:

"Q. (By Mr. Bashara) Mrs. Maniscalco, at the time you were working for Elias Brothers you testified you were receiving pay from the union? A. I don't recall testifying to that.

"Q. What is that? A. I don't remember telling anyone—

"Q. Didn't you say you got fifteen dollars a week from the union while you were working at Elias Brothers? A. To whom did I say that?

"Q. Didn't you testify to that?

"Trial Examiner: Here a while ago?

"The Witness: Oh, yes."

The facts and circumstances of this case obviously create a strong inference that this waitress was employed by the Union through her contacts with Union officials shortly before she applied for a job with Elias. It is significant that no officer of the Union was offered as a witness to the contrary.

 Accordingly, we refuse to be bound by the aforesaid credibility rulings of the Trial Examiner in this case and find no substantial evidence on the record that Elias was guilty of an unfair labor practice in replacing waitress Maniscalco. We hold that, under the facts hereinabove set forth, this waitress was not a bona fide employee within the intent of § 2(3) of the Act, 29 U.S.C. § 152(3), and she therefore is not entitled to reinstatement and back pay under the provisions of the Act. We further hold that this employee gave notice of her intent to leave and that the Company did not discharge her discriminatorily or commit an unfair labor practice in replacing her.

Enforcement is denied of that part of the order of the Board which directs the reinstatement of Ann Maniscalco with back pay plus interest. In all other respects enforcement is granted.