**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MT. VERNON TELEPHONE CORP., Respondent.**

**No. 16236.**

United States Court of Appeals Sixth Circuit.

Dec. 2, 1965.

Celebrezze, Circuit Judge, dissented.

Nancy M. Sherman, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Julius Rosenbaum, Attorney, N. L. R. B., Washington, D. C., on brief, for petitioner.

Eldred A. Gentry, Cleveland, Ohio, Stanley, Smoyer & Schwartz, Cleveland, Ohio, on brief, for respondent.

Before WEICK, Chief Judge, CELEBREZZE, Circuit Judge, and CECIL, Senior Circuit Judge.

WEICK, Chief Judge.

The National Labor Relations Board filed a petition in this Court for enforcement of its cease and desist order against respondent, Mt. Vernon Telephone Corp. The Board had found that respondent violated section 8(a) (3) and (1) of the National Labor Relations Act by discriminatorily demoting and laying off its employee, Robert Sanford, and ordered it to reinstate him with back pay. 29 U.S.C. § 158(a) (1), (a) (3). The Board's decision and order are reported at 147 N. L. R. B. 125.

Respondent is an Ohio corporation engaged in supplying telephone service to local subscribers. Sanford had been employed by respondent in a number of different jobs from October, 1948 to August, 1963. This employment had been continuous except for two years' military service and the layoff on January 15, 1963 to July 15, 1963. Sanford had been active in a union campaign to organize respondent's employees. On June 29, 1962 the union was elected exclusive bargaining representative and certified by the Board on August 8, 1962. Thereafter, on May 1, 1963, respondent and the union entered into a collective bargaining agreement to run for one year and to continue from year to year unless terminated by either party upon notice.

After holding various jobs with respondent as instrument repairman, switchman, cable helper, and lineman, Sanford was transferred to switchman on May 1, 1961, and as such he worked in the switchroom maintaining central office equipment. On July 25, 1962 Sanford was transferred back to cable help-

er, from which position he was laid off on January 15, 1963. On July 15, 1963 he was recalled as switchman pursuant to the union contract to work during vacation periods and he was again laid off on August 15, 1963. He has not since been recalled.

The Board found that Sanford's transfer from switchman to cable helper was discriminatorily motivated because of his union activities. Although the Board found a basis for the layoff from cable helper because of the introduction of labor saving equipment to that job,[1] it reasoned that the demotion from switchman was an unfair labor practice. The Board did not claim that respondent's seniority policy was discriminatorily applied. The Board also found that Sanford's layoff on August 15, 1963, after recall, was wrongful in that it was motivated by the prior discrimination and Sanford's nomination to the office of union president on August 8, 1963.

█ The Board based its finding that the demotion from switchman to cable helper was discriminatorily motivated on several factors. The Board referred to alleged coercive statements of management, to show management's preoccupation with union activities. The subject of union organizing was brought up by Sanford and discussed with Personnel Director Coleman. About the same time Manager Lahm inquired of employee Young if he had been contacted about union membership or if other employees had signed union cards. Later Superintendent Smith asked Sanford why "you guys upstairs" wanted the union, to which Sanford responded by inquiring as to Smith's basis for the question, and Smith replied, "Oh, we know." At about the same time District Manager Tanner expressed the hope to employees Blubaugh and Sanford that the union would not prevail. The National Labor Relations Act specifically provides that the expression of any views shall not be evidence of an unfair labor practice if such

expression contains no threat of reprisal or force or promise of benefit. 29 U.S.C. § 158(c). There is nothing in the above statements to indicate that they had the effect of coercion, threat of reprisal, or promise of benefit. They were made in the exercise of free speech and as such have no evidentiary value of an unfair labor practice. N. L. R. B. v. Tennessee Coach Co., 191 F.2d 546 (6th Cir. 1951).

Employee Blubaugh testified in the hearing before the Trial Examiner that respondent's President Quatman "said that within a year's time that he would be rid of the union and everbody else that had anything to do with it." Although Quatman denied making the statement, the Trial Examiner credited Blubaugh "on the basis of demeanor." The Board adopted the Examiner's findings.

█ It is clear that the crediting of a witness by a Trial Examiner is entitled to great weight by a reviewing court, but it is also true that the crediting is not conclusive on the court. The court may choose not to be bound if it believes that the crediting was improper. As stated by this Court in N. L. R. B. v. Elias Brothers Big Boy, Inc., 327 F.2d 421, 426 (6th Cir. 1964):

"In a proper case this Court may decline to follow the action of an examiner in crediting and discrediting testimony, even though the Board has adopted the Examiner's findings."

Here the Trial Examiner credited the testimony of a prejudiced witness. When Quatman was alleged to have made this statement to Blubaugh they were alone in a meeting to discuss whether Blubaugh's suspension for molesting a female employee and for intoxication, should be made permanent by dismissal. In crediting Blubaugh the Trial Examiner did not mention this incident. In addition, the Examiner apparently did not credit Blubaugh on the other aspects of

1. The union had filed charges with the Board, alleging numerous other employees had been wrongfully laid off, but the General Counsel filed a complaint relating only to Sanford.

his testimony, but did on this one aspect. The Examiner did credit Quatman's testimony on some other matters, but discredited his denial of making the statement in question.

■ The Examiner also credited employee Young over Manager Lahm relative to Young's testimony that Lahm stated that the Company would accelerate introduction of labor saving equipment because of the advent of the union. Lahm denied making the statement, and the Examiner credited Young because he was a reluctant witness for the Board under subpoena. This seems to be a thin ground since all of the Board's witnesses were under subpoenas. Following this to its logical conclusion, all of the subpoenaed witnesses should be credited irrespective of their testimony. The General Counsel did not ask to cross-examine Young as a hostile witness. In any event, this statement, if true, is not entitled to much weight because where an employer makes a change which results in displacing employees for sound economic reasons, that action is not wrongful even though accelerated by union activity. N. L. R. B. v. Rapid Bindery, Inc., 293 F.2d 170, 174 (2nd Cir. 1961).

■ The Board found that respondent had no business motives for demoting and laying off Sanford. Rather, it concluded that respondent's action was wrongfully motivated by Sanford's union activity. Its decision is based entirely on inferences. However, the entire record must be reviewed and overbearing evidence calling for contrary inferences, must be considered. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

There is substantial evidence to support respondent's position that the fourth man was not needed in the switchroom, and that operations were effectively carried on with only three men. With four men in the switchroom they were idle at times. Sanford's job was never refilled since his transfer to cable helper on July 25, 1962. This is strong evidence of the economic justification for his transfer. In addition, less overtime was worked in the switchroom with three employees following Sanford's demotion, than with four employees prior to the reduction. The equipment in the switchroom was almost free of fault after the reduction as shown by a testing device. This would tend to show the absence of need for an additional man.

The absence of this need is further shown by the amount of time a traveling maintenance crew spent at respondent's plant after the reduction. At best there was an increase of 3.6 hours per week. President Quatman came to the conclusion after about fourteen months of operating the switchroom with four men, that the operating cost was too high and that a fourth man was not needed. The initial decision to add a fourth man had come after four to five years of disagreement between Quatman and the local Manager over the necessity of adding a fourth man. President Quatman had a right to revaluate his decision and to retract it in the absence of improper motivation. The fact that Local Manager Lahm urged President Quatman to add additional help in the switchroom was merely a continuation of the long disagreement over a fourth man.

Although the three remaining men in the switchroom worked harder after the reduction, in part due to the installation of new long distance dialing equipment, the record does not show that the extra work could not be handled effectively by three men and that a fourth was needed.

As pointed out before, the Trial Examiner did not question the layoff of the cable helpers. He complained about the transfer of Sanford from switchman to cable helper in contemplation of the layoffs. But Sanford had previously been a cable helper for about five and one-half years. He held the job as switchman for slightly less than fifteen months, and then only because President Quatman gave in, against his better judgment, to the arguments of Manager Lahm. Under these circumstances it can hardly be said that Sanford's job as switchman was permanent. The respondent was not re-

quired to keep him in that position when his services were no longer needed.

■ The Board cited the fact that District Manager Tanner in a letter recommended a "good company man" for a position over another person whose brother in another plant was pro-union. Although this letter does provide a basis for an inference of respondent's general hostility toward unions, it does not provide a basis for an inference of wrongful motive as to a specific discharge. N. L. R. B. v. Atlanta Coca-Cola Bottling Co., 293 F.2d 300 (5th Cir. 1961), rehearing denied, 296 F.2d 896 (1961). The letter here did not relate to Sanford.

The Trial Examiner found that respondent was considering keeping Sanford as a fourth switchman beyond the vacation period when Sanford was recalled on July 15, 1963, but that this plan was abandoned when respondent learned of Sanford's renewed union activity and his nomination for president of the union on August 8, 1963. This was based on "the August 15 action in relation to Sanford's nomination and * * * the prior discrimination. * * *"

In our opinion, the evidence does not establish that respondent intended to retain Sanford beyond the vacation period. The inference which the Trial Examiner drew in this respect was not justified. It is admitted that Sanford was specifically recalled for the vacation period and his tenure after that time was uncertain.

■■ The Board's determination of a violation of the Act must be based on substantial evidence, not on speculation. Here speculation was the only basis for a decision that Sanford was to be recalled for longer than the vacation period.

Enforcement denied.

CELEBREZZE, Circuit Judge (dissenting):

With the utmost respect, I must dissent from the majority opinion.

The Respondent knew of Sanford's Union activities. Management had a list of Union men, and also a list of the nominees for Union office. There was conflicting evidence of Union hostility. It is alleged that President Quatman told employee Blubaugh that "within a year's time he would be rid of the Union and everybody else that had anything to do with it". District Manager Tanner, in a letter dated November 29, 1962, recommended a "good company man" over another because the other employee had a brother at Mt. Vernon who was on the Union side and "after going through the developments of the last six months here at Mt. Vernon, I hesitate to take a chance on anyone".

The Respondent maintains that the reduction in the number of switchmen from four to three was based on economic considerations. The Respondent showed that there was less overtime worked after the reduction in the switchroom than before the reduction. Also, certain testing devices showed the office equipment operated efficiently. However, after the reduction, Telephone Service, Inc., an affiliate of Respondent, increased its maintenance work in the switchroom. The Respondent was in the process of installing long distance dialing equipment which required the exclusive service of one switchman from four to six hours a day. Local Manager Lahm urged that a fourth man be added to the switchroom. In a letter to President Quatman dated September 27, 1962, Manager Lahm said:

> "Quite frankly was are not getting the maintenance we should and with the approaching winter season and the increased load it brings, I'm sure we are in for trouble. I believe this is due to two things, lack of help and lack of supervision.
>
> "In all this time with this added load we have actually reduced our work force. I think it is time a long hard look were taken at this situation, for if we don't we are asking for trouble."

On these facts the Board adopted the Trial Examiner's finding that Sanford's lay-offs were motivated by Respondent's hostility toward the Union. The ques-

982

tion of motivation is a close one. The credibility of witnesses and the reasonable inference to be drawn from the evidence are matters for determination by the Trial Examiner and the Board. National Labor Relations Board v. Bendix Corp., 299 F.2d 308 (C.A.6, 1962); National Labor Relations Board v. Interurban Gas Corp., 317 F.2d 724 (C.A.6, 1963); National Labor Relations Board v. Plaskolite, Inc., 309 F.2d 788 (C.A.6, 1962). The Board's choice between two conflicting views may not be set aside even though the Court would justifiably have made a different choice had the matter been before it de novo. National Labor Relations Board v. Bendix Corp., supra; National Labor Relations Board v. Interurban Gas Corp., supra.

It is true that in a proper case the Court may decline to follow the findings of an Examiner as to the credibility of a witness. National Labor Relations Board v. Elias Brothers Big Boy, Inc., 327 F.2d 421 (C.A.6, 1964). In that decision the following from National Labor Relations Board v. Pyne Molding Corporation, 226 F.2d 818, 819 (C.A.2, 1955) was quoted:

"Although the Board may not overrule its Trial Examiner by discarding the positive credible testimony of a witness in favor of an inference drawn from tenuous circumstances * * * it may refuse to follow its Trial Examiner in crediting testimony where it conflicts with well supported and obvious inferences from the rest of the record. Such refusal is particularly justified where the testimony in question is given by an interested witness and relates to his own motives."

In the Elias Brothers case, Mrs. Maniscalco claimed she was wrongfully discharged. She was the direct beneficiary of a back pay order, and it was solely her testimony which was relied upon to prove the claim of an unfair labor practice. Further, during her brief employment with Respondent, she worked part time for the Union, and after she left the Respondent she worked full time for the Union as a paid organizer. Also there was corroborated testimony that she gave notice she was leaving the Respondent. Unlike the present case, the testimony of Mrs. Maniscalco conflicted in many respects with the "well supported and obvious inferences from the rest of the record".

The record shows the Union won the election by a close margin of 19 to 15; that Sanford was one of the four organizers of the Union; and that Respondent knew of Sanford's active participation in the Union. Several weeks after the election Sanford was demoted and subsequently laid off. After his reemployment, he was nominated to the Union office of President and within a week he was again laid off. The Trial Examiner gave credence to Blubaugh's testimony that President Quatman said that he would be rid of the Union within a year. The record also shows that the Respondent installed new long distance dialing equipment which placed an additional work load on the switchmen. Even though there was less overtime worked after the reduction in the switchroom, Telephone Service, Inc. increased its maintenance work in the switchroom, and local Manager Lahm urged President Quatman to add additional help in the switchroom.

Considering these facts, it can be said that there is substantial evidence to support the inference that Sanford's layoffs were discriminatorily motivated and illegal under 8(a) (1) and (a) (3). Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456 (1951); National Labor Relations Board v. Kingsford, 313 F.2d 826 (C.A.6, 1963).

For these reasons I find it necessary to dissent.